UNITED STATES

v.

**Sergeant Michelle M. ACCORDINO, FR 110–48–3378 United States Air Force.**

ACM S25705.

U. S. Air Force Court of Military Review.

Sentence Adjudged 12 May 1982.

Decided 1 March 1983.

[black rectangle redaction]

Appellate Counsel for the Accused: Colonel George R. Stevens, Major William H. Lamb, and Captain Patrick A. Tucker, USAFR. Captain Alan B. Ollila filed a brief on behalf of the Accused.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Captain Robert L. Kuster.

Before HODGSON, HEMINGWAY and MILLER, Appellate Military Judges.

## DECISION

MILLER, Judge:

Tried by special court-martial with members, the accused was convicted of wrongfully using cocaine and marijuana, in violation of Article 134, U.C.M.J., 10 U.S.C. § 934.[1] She was sentenced to a bad conduct discharge, forfeiture of $250.00 and reduction to Airman First Class.

## FACTS

The government's case rests chiefly on the testimony of Staff Sergeant Dugan, an informant for the Office of Special Investigations (OSI) and a former neighbor and friend of the accused. The accused and Dugan were assigned to MacDill Air Force Base, Florida, in the fall of 1980 and became acquainted in the summer of 1981. Sometime after the Fourth of July the accused and her husband, John, were at Dugan's house. John asked Dugan if he "wanted to do some." Dugan took this to mean cocaine and acknowledged that he would. John produced a rock-like substance, light beige in color, which he identified as cocaine. After John reduced the "rock" to a powder, the accused, along with the others, "snorted" the substance by using a straw. Dugan indicated the powder numbed his nose and tongue and gave him a "rush" and "a real light feeling." The

procedure was then repeated a second time, and both Dugan and the accused used a similar substance with others numerous times during the ensuing weeks. Dugan admitted, however, that he had never used cocaine before and had no knowledge of what it looked like, and evidence was presented at trial that non-controlled drugs are available in the MacDill area that have a numbing effect on the nose and tongue similar to that of cocaine. Clearly, Dugan's initial identification of the substance as cocaine had been based on John Accordino's assertion that the substance he provided to Dugan and the accused was, in fact, cocaine.

During this same period Dugan saw the accused use marijuana on many occasions. Dugan is familiar with marijuana having used it since 1977.

In March 1982, in a conversation with a friend, the accused expressed annoyance with the OSI's investigation, and stated that she and John had quit. Nothing further was said.

At trial, the accused denied using cocaine and marijuana during July. She contended that Dugan was biased toward her because he suspected her husband, John, of having an affair with his wife. She maintained that her statement that "she and John had quit" had nothing to do with drugs and that she was upset at the time.

## ISSUES

We, here, discuss the following four errors asserted by appellate defense counsel; the last two arose as a result of events occurring subsequent to trial:

I. THE EVIDENCE IS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT THE FINDINGS OF GUILTY OF THE CHARGE AND SPECIFICATIONS 1 AND 3. ALTHOUGH THE CHIEF GOVERNMENT WITNESS STATED THAT THE ALLEGED OFFENSES OCCURRED DURING JULY, HE FAILED TO IDENTIFY THE YEAR THAT THEY ALLEGEDLY OCCURRED.

1. She was acquitted of an additional allegation of wrongfully using cocaine.

II. THE EVIDENCE IS INSUFFICIENT TO SUPPORT THE FINDING OF GUILTY TO USE OF COCAINE UNDER SPECIFICATION 1. THE CHIEF GOVERNMENT WITNESS' PURPORTED IDENTIFICATION OF THE SUBSTANCE AS COCAINE WAS BASED UPON PURE CONJECTURE, HIS NEVER HAVING USED OR SEEN COCAINE BEFORE.

III. THE STAFF JUDGE ADVOCATE'S REVIEW IS PREJUDICIALLY INADEQUATE AND MISLEADING WITH RESPECT TO CLEMENCY. THE REVIEWER FAILED TO PROPERLY ADDRESS THE CLEMENCY RECOMMENDATIONS SUBMITTED IN THAT HE MADE NO ATTEMPT TO RATIONALIZE WHY HIS RECOMMENDATION "AGAINST CLEMENCY" DIFFERED FROM THE "PRO–CLEMENCY" RECOMMENDATIONS CONTAINED THEREIN.

IV. THE APPELLANT WAS DENIED A FAIR TRIAL. ACCORDING TO A POST–TRIAL AFFIDAVIT OF A COURT MEMBER WHICH, UNDER MIL.R.EVID. 606(b), MAY NOW BE CONSIDERED BY BOTH APPELLATE AND TRIAL COURTS, THE PRESIDENT OF THE COURT, ACTING BY VIRTUE OF HIS RANK, TERMINATED A FULL AND FREE DISCUSSION OF THE EVIDENCE.

I

DOES THE FACT THAT THE GOVERNMENT DIRECTLY ESTABLISHED THE MONTH BUT NOT THE YEAR DURING WHICH TWO OF THE ALLEGED OFFENSES OCCURRED, MANDATE A REVERSAL OF FINDINGS WITH RESPECT TO THESE TWO OFFENSES?

■ We look first to the accused's contention that the chief government witness testified only that two of the offenses took place during July, and did not state what year; thus, it is possible that the alleged offenses were committed in 1979 or 1978, and, if so, prosecution is barred by the statute of limitations. Article 43(c), U.C.M.J., 10 U.S.C. § 843(c). Our examination of the record reveals ample evidence, both direct and circumstantial, that the alleged offenses took place in July, 1981. Consequently, their prosecution is not barred by the statute of limitations.

II

DOES THE FACT THAT THE CHIEF GOVERNMENT WITNESS ADMITTED HE HAD NEVER SEEN OR USED COCAINE PRIOR TO HIS INITIAL USE WITH THE ACCUSED (THE FIRST OF TWELVE TO SEVENTEEN CHARGED USES BY THE ACCUSED TO WHICH THE CHIEF WITNESS TESTIFIED), AUTOMATICALLY, REDUCE HIS IDENTIFICATION OF THE SUBSTANCE USED ON ALL OF THESE OCCASIONS TO MERE CONJECTURE, REGARDLESS OF WHAT OTHER EVIDENCE THE GOVERNMENT PRESENTED AT TRIAL TO SUBSTANTIATE THESE IDENTIFICATIONS?

■ We next consider the accused's contention that the evidence is insufficient to support a conviction for wrongful use of cocaine. She urges that the chief witness' identification of the substance as cocaine was purely inadmissible conjecture because he acknowledged never having used cocaine prior to the time of the initial offense charged within the time period of the specification.

Again, there is ample evidence of record to convince us that the accused was properly convicted of the cocaine offense.

As already indicated, the chief government witness, during his testimony, indicated that he and the accused first used cocaine together shortly after 4 July 1981.

He acknowledged that since he had never tried cocaine before, his conclusion that the substance used on this occasion was cocaine had been primarily based upon the statement of the individual who had provided the substance. He also averred that the substance which he and the accused had initially used was in "rock" form, and that upon "snorting" it, he felt a "numbing" of his nose and mouth and a "rush" in his head.

Had evidence of the accused's cocaine use during July 81 been limited to this testimony, we might agree that it was insufficient to sustain the accused's conviction.

It was not!

Indeed, numerous additional evidentiary matters were introduced by the Government, which, save acceptance of the accused's personal denial of any wrongdoing whatever, (a view not supported by the evidence of record relating to the other charges) preclude any reasonable hypothesis other than guilt.

Looking, first, to the rest of the chief government witness' testimony concerning his initial use of cocaine with the accused, we note that:

A. The opinion he gave at trial as to the nature of the substance he and the accused had used on that first evening was not hampered by inexperience.[2]

[A] witness need not be a chemist, nor be possessed of training that would qualify him to identify the substance in question by chemical analysis, in order to give his opinion as to the identity of a particular drug . . .

\* \* \* \* \* \*

The issue is whether sufficient foundation was laid to qualify . . . [a witness] to testify as to the identity of . . . [a drug] *at the time of trial.* If . . . [the witness] were so qualified, then his

qualifications relate back as well as forward . . . [Emphasis in original.]

*United States v. Jackson,* 49 C.M.R. 881, at 883 and 882, note 2 (A.F.C.M.R. 1975).

B. When the chief witness testified that his initial identification of the substance as cocaine was based primarily upon a statement made by the individual who provided the substance, he also identified the individual who provided the substance as the accused's husband. Additionally, he testified that the use had occurred in the accused's home and that immediately upon stating that the "rock-like" substance was cocaine, the accused's husband not only prepared it for use, but was the first to use it, followed promptly by the accused, the chief witness' wife and, finally, the chief witness, himself, in that order. All four parties were present throughout these successive events. The chief witness also recalls conversations among the four to the effect that it was "good coke."

[A] contemporaneous declaration as to the nature of a substance by a person using the material, and who may be presumed to know its nature, is evidence of the identity of the substance. *United States v. Weinstein,* 19 U.S.C.M.A. 29, at 30, 41 C.M.R. 29, at 30 (1969). *Accord, United States v. Fitzhugh,* 14 M.J. 595, at 597 (A.F.C.M.R. 1982); *United States v. Villamil-Durand,* 46 C.M.R. 1070, at 1071 (A.F.C.M.R.1973).

C. The chief witness' testimony as to both the form of the substance that he initially used and the effects of that substance upon him were later established to be a combination of qualities

2. At trial the witness stated that the substance was, in fact, cocaine. He related that he had subsequently gained familiarity with it, and that the numbing of the mouth and tongue and the warm rush he received from its use, was the same as he had experienced in that initial use of cocaine with the accused. Additionally, the accused acknowledged that she was subsequently "turned in" to the OSI by Airman G. for "drug dealing."

Airman G.'s later testimony related to casual transfers and use of cocaine by the chief witness in September 1981.

unique to cocaine via expert testimony.[3]

Because this testimony provided the jurors with technical knowledge necessary to distinguish the effects of cocaine from those of other drugs, it certainly assisted the jury in determining whether the substance the chief witness used with the accused was cocaine or some other drug. Lacking any prejudicial impact, it was, therefore, properly admitted.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert, by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Mil.R.Evid. 702.

Further, the jury may properly have relied upon this testimony, alone, in making its determination that the substance the Government's chief witness had described was, in fact, cocaine. Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

Mil.R.Evid. 704.

Secondly, looking to the testimony of the chief witness regarding the *eleven to sixteen subsequent occasions within the time span of the specification on which he "snorted" cocaine with the accused,* it is immediately apparent that his previous familiarity with the drug on any and all of these occasions was uncontested. Even were we to accept a hypothetical argument that because the government failed to establish the witness' interim use of cocaine from any source other than the initial one, it would be absurd to conclude that he could not use his *initial* experience with a subject identified to him as cocaine to render *subsequent* opinions as to the identity of that substance. While, the weight to be given such opinions may be adversely affected by such a circumstance, in this case the accused's opinions and the inferences the jury drew from them were rationally based upon the witness' perceptions.[4] His opinions not only helped the the jury understand the

---

3. Captain Paul J. Shonebarger, an Air Force pharmacist assigned to MacDill Air Force Base, Florida, after establishing his credentials as an expert in drug identification, testified that cocaine is sometimes available in block form, generally for ease of asportation in illegal drug trade. He also indicated it is generally "snorted" in its powder form through the nose, often through use of a straw (the manner in which the chief witness described its use). He acknowledged that other drugs, in particular Dyclonine, exist that look similar to the powdered form of cocaine and, during cross-examination, he also conceded that although he had never heard nor could think of any reason why a non-controlled substance such as Dyclonine would be compressed into a block form, an expert technician possessing the proper equipment could probably do so. He also acknowledged that at least ten legal topical anesthetics, some of which could conceivably be produced in a powdered form (most are ordinarily produced in aerosol form), mimic the anesthetic or "numbing" characteristics of cocaine. He specifically indicated, however, that none of these other substances, including Dyclonine, possess the additional characteristic, unique to cocaine, of producing a "rush" or increase in awareness of the brain.

4. The witness testified that his second use of cocaine with the accused occurred on the day following their initial use. The same people were present as during the first use and the accused's husband again supplied the substance, slicing it from its rock form. The witness testified that the substance affected him in the same manner as had the substance identified to him the previous night as cocaine. His conclusion on that occasion that the substance was cocaine came not from a reiteration of the substance's identity by the accused's husband, but from the experience he had gained the night before. The witness then testified that he continued to use cocaine with the accused, two to three times a week (by conservative calculations, on at least 10 additional occasions) from that night, shortly after the 4th of July, until mid-August. He described this subsequent use of cocaine with the accused as very similar to social drinking, saying it occurred at both his house and the accused's, and describing the cocaine used as being of lesser quality than the cocaine used on the first two occasions. The cocaine used on these subsequent occasions was contemporaneously used by persons other than those present during the witness' initial two uses of cocaine.

testimony of the witness, but they were helpful to it in determining whether or not the substance used on all twelve to seventeen occasions was, in fact, cocaine. *See United States v. Jackson, supra.* Consequently, this relevant testimony was properly considered by the jury in arriving at its "beyond a reasonable doubt" determination that the substance identified by the accused was cocaine.

> If the witness is not testifying as an expert, the testimony of the witness in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue.

Mil.R.Evid. 701.

Having carefully reviewed all the evidence of record, we conclude the substance used by the accused was, in fact, cocaine.

### III

MAY AN ALLEGED ERROR PERTAINING TO THE TREATMENT OF CLEMENCY MATTERS IN A STAFF JUDGE ADVOCATE'S REVIEW BE ASSERTED FOR THE FIRST TIME BEFORE A MILITARY COURT OF REVIEW?

■ The accused also maintains that the staff judge advocate's review is prejudicially inadequate and misleading in its discussion of clemency matters. She avers that the reviewer failed to properly address the clemency recommendations submitted by her commander, first sergeant, supervisor, and co-workers because he did not attempt to rationalize why his opinion which recommended "no clemency" differed from their opinions that clemency should be granted.

Trial defense counsel, in his *Goode*[5] response did not challenge the reviewer's treatment of clemency matters. Assuming, *arguendo,* the review is deficient, the error was waived by counsel's failure to comment, by the mandate issued in *United*

States v. Goode, 1 M.J. 3 (C.M.A.1975). It was this type of complaint that *Goode, supra,* was intended to resolve. *United States v. Schrock,* 11 M.J. 797 (A.F.C.M.R.1981); *United States v. LaChapelle,* 10 M.J. 511 (A.F.C.M.R.1980).

### IV

DOES MIL.R.EVID. 606(b), AS AN EXCEPTION TO ITS GENERAL DECLARATION THAT COURT MEMBERS ARE INCOMPETENT TO TESTIFY OR SUBMIT AFFIDAVITS CONCERNING ANY MATTERS OR STATEMENTS THAT OCCUR DURING THE COURSE OF COURT PANEL DELIBERATIONS, RENDER THESE SAME COURT MEMBERS, NONETHELESS, COMPETENT TO TESTIFY AND SUBMIT AFFIDAVITS CONCERNING ANY MATTER OR STATEMENT CONCERNING OR MADE BY A SENIOR MEMBER DURING COURT PANEL DELIBERATIONS THAT MAY, SOLELY BY VIRTUE OF THAT SENIOR MEMBER'S RANK, HAVE SWAYED A COURT MEMBER JUNIOR TO HIM?

Finally, appellate counsel direct our attention to a sworn affidavit from Captain W., a member of the accused's court panel, which reads:

> On the 11th and 12th of May 1982, I served as a member of a court-martial board hearing the case of Sergeant Michelle M. Accordino. On 12 May 1982, the Board retired for deliberations. I attempted to initiate a discussion on whether or not there was proof that the drug in question was cocaine but was told by the President of the Board that it didn't matter. I protested as did Lt. Gottlieb (another member). I then attempted to discuss the question of the veracity of the two prosecution witnesses who allegedly saw the defendant use drugs. The President of the Board said there was no need to discuss this as by now everyone on the Board had made up his own mind. The Board then voted.

5. *United States v. Goode,* 1 M.J. 3 (C.M.A. 1975).

The accused contends that, because this affidavit "reflects the existence of [the type of] improper influence upon the court-martial members" that the language of the Drafters' Analysis to Mil.R.Evid. 606(b) specifically indicates jurors may testify to, this Court should make findings of fact in accordance with the contents of this sworn affidavit. They then suggest that in accordance with these findings of fact, this court should set aside both the findings and sentence in this case.

Since the accused's contention is based upon the Drafter's Analysis of Mil.R.Evid. 606(b), rather than upon Mil.R.Evid. 606(b) itself, we begin our analysis of this assertion of error, by carefully comparing the precise language of the rule with that language from the Drafters' Analysis to this rule that has been cited by the accused in support of her proposition.

Mil.R.Evid. 606(b) is patterned almost directly after Fed.R.Evid. 606(b). It appears intended to incorporate the federal evidentiary principles regarding "a court member's general competency to testify or submit affidavits concerning any matters or statements that occur during the course of court panel deliberations" into the military justice system, in their entirety.[6]

A look at the precise language of these two Rules, strongly reinforces this incorporation concept.

Mil.R.Evid. 606(b) reads:

*Inquiry into validity of findings or sentence.* Upon an inquiry into the validity of the findings or sentence, a member may not testify as to any matter or statement occurring during the course of the deliberations of the members of the court-martial or to the effect of anything upon the member's or any other member's mind or emotions as influencing the member to assent or dissent from the findings or sentence or concerning the member's mental process in connection therewith, except that a member may testify on the question whether extraneous prejudicial information was improperly brought to the attention of the members of the court-martial, whether any outside influence was improperly brought to bear upon any member, or whether there was unlawful command influence. Nor may the member's affidavit or evidence of any statement by the member concerning a matter about which the member would be precluded from testifying be received for these purposes.

Fed.R.Evid. 606(b) reads:

*Inquiry into validity of verdict or indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Clearly both rules render jurors incompetent to testify concerning any matters occurring during the course of jury deliberation other than those specifically enumerated within the rules themselves.

---

**6.** Indeed the very Drafters' Analysis cited by the accused in support of her position here, in its analysis to Mil.R.Evid. 101(a), which sets forth the scope and applicability of all the Military Rules of Evidence, states that:

[While t]he decisions of the United States Court of Military Appeals and of the Courts of Military Review *must* be utilized in interpreting these Rules ... specific decisions of Article III courts involving rules which are common both to the Military Rules and the Federal Rules should be considered *very* persuasive ... *[A] significant policy consideration in adopting the Federal Rules of Evidence was to ensure, where possible, common evidentiary law.* [Emphasis added.]

M.C.M., Appendix 18, Rule 101, Analysis (a), p. A–18–2.

Fed.R.Evid. 606(b) permits jurors to testify only as to the questions of (1) "whether extraneous prejudicial information was improperly brought to the jury's attention," and (2) "whether any outside influence was improperly brought to bear upon any juror."

Mil.R.Evid. 606(b) permits jurors to testify only as to the questions of (1) "whether extraneous prejudicial information was improperly brought to the attention of the members of the court-martial [the military jury's attention]," (2) "whether any outside influence was improperly brought to bear upon any member [military juror]," and (3) "whether there was unlawful command influence."

In the words of Professor Saltzburg: . . . [Mil.R.Evid. 606(b) ] is virtually identical with its federal counterpart, except that the drafters added a specific provision addressing command influence.

Saltzburg, Schinasi, and Schlueter, Military Rules of Evidence Manual, (1981), at 283–284.

The virtual identity of the two rules becomes even more pronounced when it is realized that, logically, the addition of a "command influence" provision to Mil.R. Evid. 606(b), rather than adding some unique provision to the military rule, merely emphasizes that the obvious fact that "command influence" (a matter of historical concern to Congress) constitutes a particular type of the same "outside influences" already excepted from the incompetency dictates of both the Federal and Military Rules. (See the second specified exception of each.)

When one looks to the Drafters' Analysis appended to Mil.R.Evid. 606(b) cited by the accused in support of her contention, however, one's confidence in the apparent identity of these two rules is badly shaken. For this Analysis to Mil.R.Evid. 606(b) states that:

Rule 606(b) is taken from the Federal Rule with only one significant change. The Rule, retitled to reflect the sentencing function of members, recognizes unlawful command influence as a legitimate subject of inquiry and permits testimony by a member on that subject. The addition is required by the need to keep proceedings free from any taint of unlawful command influence and further implements Article 37(a) of the Uniform Code of Military Justice. Use of superior rank or grade by one member of a court to sway other members would constitute unlawful command influence for purposes of this Rule under ¶ 74d (1). Rule 606 does not itself prevent otherwise lawful polling of members of the court, *see generally, United States v. Hendon*, 6 M.J. 171, 174 (C.M.A.1979), and does not prohibit attempted lawful clarification of an ambiguous or inconsistent verdict. Rule 606(b) is in general accord with present military law.

M.C.M., Appendix 18, Rule 606, Analysis (b), pp. A18–86–A18–87.

The M.C.M. paragraph referenced by this Analysis as the basis of its assertion that an additional "exercise of rank" exception must be attributed to Mil.R.Evid. 606(b) because of its separate "command influence" exception, reads in part:

Deliberation may properly include full and free discussion as to the merits of the case. The influence of superiority in rank shall not be employed in any manner in an attempt to control the independence of members in the exercise of their judgment.

M.C.M., ¶ 74d (1).

■ In essence, despite the fact that the drafters wrote Mil.R.Evid. 606(b) in a manner capable of being interpreted entirely consistently with its federal counterpart,[7] the drafters' analysis of this particular rule

---

7. Indeed, according to that portion of this same drafters' analysis that deals, generally, with the intended scope and applicability of all the Military Rules of Evidence, in the absence of an explicit contrary interpretation of a Military Rule of Evidence by an appellate military court, each of the evidentiary rules should be interpreted, whenever possible, so as to conform to existing interpretations of the particular Federal Rule of Evidence upon which the Military Evidentiary Rule was originally based. *See* Analysis to Mil.R.Evid. 101(a), *supra*, at note 6.

indicates that the drafters did not intend the rule to be interpreted in that manner. To the contrary, they specifically state that the "command influence" exception they created in this particular evidentiary rule was meant by them to apply to certain "intrajury influences" within the jury deliberation room exercised by jurors upon other jurors; a concept, which, up until this time, has been forever prohibited by exactly those very federal *stare decisis* principles which originally formed the bases of Fed.R. Evid. 606(b).[8]

If we were to incorporate the language and rationale from this drafters' analysis to Mil.R.Evid. 606(b) into our interpretation of the Rule, itself, we would not only be required to consider the content of the instant affidavit, but, in all likelihood,[9] we would be required to return this case to the trial court for a detailed inquiry, via examination of all court members, into the intrajury influences that are alleged therein.[10]

On the other hand, if we interpret Mil.R. Evid. 606(b) in accordance with the meaning attributed to its language by federal and military *stare decisis,* we would be forbidden from even considering this assign-

ment of error, since neither the affidavit, itself, nor the testimony of any court panel member concerning the affidavit's subject matter, could be accepted or considered by us.

We thus confront the threshold issue of the question before us. Should we, in accordance with the drafters' intent as expressed in the drafters' analysis to Mil.R. Evid. 606(b), accept the instant affidavit as competent evidence that misconduct materially prejudicial to the substantial rights of the accused may have occurred during jury deliberations, or should we, heeding federal and military *stare decisis* relating to the language of Mil.R.Evid. 606(b), reject this affidavit as originating from an incompetent source?

Because the instant case represents the first occasion on which an accused has attempted to utilize this language from the Drafters' Analysis to Mil.R.Evid. 606(b) to gain access to what has heretofore been the sacrosanct domain in both civilian and military courts of intra-jury matters occurring within jury deliberation rooms and because the espoused intent of the drafters as ex-

8. In light of this glaring conflict with federal *stare decisis,* I attempted to verify the actual intent of the referenced language from the Drafters' Analysis, by taking the unusual step of having one of Mil.R.Evid. 606(b)'s drafters queried as to that intent. He not only affirmed that the drafters intended to permit invasion of the sanctity of military jury rooms upon sworn allegations of influence of rank therein, but he also indicated that this same intent is presently being unmistakenly detailed in a new Manual for Courts-Martial currently being drafted by a joint armed forces committee.

9. Looking to military precedents relating to influence of superior rank, we find that military courts have already routinely recognized the effects of such influence upon: (1) Congress' enactment of U.C.M.J., Article 31, 10 U.S.C. § 831, *see United States v. Gibson,* 3 U.S.C. M.A. 746, 14 C.M.R. 164 (1954), *United States v. Smith,* 13 U.S.C.M.A. 105, 32 C.M.R. 105 (1962), *see also United States v. Planter,* 18 U.S.C.M.A. 469, 40 C.M.R. 181 (1969), and extended that recognition to encompass both (2) regulatorily prescribed efforts at assisting servicemen in overcoming personal debts via appropriate financial counseling, *see United States v. Seay,* 1 M.J. 201 (C.M.A.1975), and (3), otherwise voluntarily granted consents to

search, *see, United States v. Middleton,* 10 M.J. 123 (C.M.A.1981). In the face of these precedents, it would be extremely difficult for this court to ignore the influence, solely by virtue of the superior rank carried on his shoulders, that a court panel president's (a court panel president is by definition the senior ranking member of a court panel, *see* M.C.M. ¶ 40*a*) authoritative denial of a junior court member's request for discussion concerning a key issue in a case, would likely have upon that junior court panel member's continued insistence upon the "full and free discussion" (*see* MCM ¶ 74*d*(1)) of such an issue, to which any accused is presumably entitled.

10. Although, the affidavit, in and of itself, does not establish as a fact that a junior court member was swayed by a senior court member's use of rank, it does establish a *prima facie* suspicion that such an event occurred. Accordingly, if, as the drafters' analysis to Mil.R. Evid. 606(b) states, the remaining court members are competent to testify regarding this allegation, its merits should be resolved at the trial level through a detailed inquiry, including an examination of each other member of the court panel.

pressed in their analysis to Mil.R.Evid. 606(b) so directly conflicts with all existing *stare decisis* on the same subject, we feel compelled to carefully scrutinize the rationale underlying this existing *stare decisis* before rendering our decision regarding this matter.

We begin our analysis by conducting an historical examination of that *stare decisis* which underlies the Federal Rule of Evidence upon which Mil.R.Evid. 606(b) is indisputably based.

Initially, we note that Fed.R.Evid. 606(b) is, to this day, fundamentally based upon the Supreme Court's adoption in *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), of an opinion Justice Gray wrote while a member of the Supreme Judicial Court of Massachusetts.

Saying that Justice Gray's opinion in *Woodward v. Leavitt*, 107 Mass. 453 (1871), was based upon a proper application of numerous authorities and that "the rule thus laid down [was] conformable to right reason and sustained by the weight of authority," Chief Justice Fuller, writing for a majority of the United States Supreme Court, restated [11] the *Woodward* Court's conclusion in the following terms:

> ... [T]he evidence of jurors as to the motives and influences which affected their deliberations, is inadmissible either to impeach or to support a verdict. But a juryman may testify to any facts bearing upon the question of the existence of any *extraneous* influence, although not as to how far that influence operated upon his mind. So a juryman may testify in denial or explanation of acts or declarations *outside* of the jury room, where evidence of such acts has been given as ground for a new trial. [Emphasis added.]

*Mattox v. United States, supra,* 146 U.S. at 149, 13 S.Ct. at 53, 36 L.Ed. at 921.

Unfortunately, as a result of Chief Justice Fuller's restatement of the rule, the gist of the underlying rationale that Chief Justice Fuller also purported to adopt from *Woodward* became far less apparent.

In view of the fact that both Fed.R.Evid. 606(b) and Mil.R.Evid. 606(b) are based upon the *Woodward* rule and its rationale as adopted by the Supreme Court in *Mattox,* the time to revisit *Woodward,* itself, has most certainly arrived.

Factually, the *Woodward* case involved a motion for a new trial based upon allegations of three non-jurors that a juror named Brown had formed and expressed to each of them an opinion as to the proper verdict in the case before the trial had ever started. The trial judge, conducting an inquiry into these allegations, had permitted the juror Brown to testify in explanation of the facts and statements which the moving party relied upon to prove Brown's formation and expression of such an opinion. The judge had also permitted Brown to testify that during deliberations he had originally voted in favor of the moving party and other jurors to testify that Brown neither took part in deliberation discussions nor made any attempt to influence them in regard to their decisions as to the verdict. *See* Chief Justice Chapman's statement of the facts, *Woodward v. Leavitt, supra,* at 458–459.

11. It is unclear from Chief Justice Fuller's opinion in *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), that his enunciation of the rule originally announced in *Woodward v. Leavitt,* 107 Mass. 453 (1871) differed slightly from the terms used in *Woodward,* because the Chief Justice's enunciation of the rule was enclosed by quotation marks. Thus, several Courts of Appeal have erroneously indicated that the Chief Justice's restatement of the rule quoted the language used in *Woodward,* itself. These same Courts, also apparently assumed (again, erroneously) that the rationale of *Woodward,* which the Supreme Court expressly adopted as its own, dealt generally with the admissibility of any juror testimony regarding extraneous influences upon the jury, rather than limiting the admissibility of such testimony strictly to instances in which a specific juror accused by a non-juror of exposure to prejudicial outside influences that predated sequestering of the jury, is asked to respond to such allegations. *See, e.g., United States v. Wilson,* 534 F.2d 375 (D.C.Cir.1976); *Government of Virgin Islands v. Gereau,* 523 F.2d 140 (3d Cir.1975); *United States ex rel. Owen v. McMann,* 435 F.2d 813 (2d Cir.1970); *Miller v. United States,* 403 F.2d 77 (2d Cir. 1968).

After an exhaustive review of both British and American cases on the subject, Justice Gray, writing for the Massachusetts Court, reached the following conclusion:

[O]ur conclusion is, that the testimony of the juryman Brown in explanation of the facts and statements relied on to prove that he had formed and expressed such an opinion as was attributed to him, was rightly admitted, as directly tending to meet and explain the testimony introduced by the plaintiff, and not concerning anything that passed in the jury room; but that the testimony of Brown and other jurors as to the part which he took in the discussions and votes of the jury was incompetent and should have been excluded, because it related to the private deliberations of the jury, and had no tendency to disprove that he had previously expressed and still entertained an opinion inconsistent with an impartial discharge of his duty.

*Woodward v. Leavitt, supra,* at 471.

In reaching this conclusion, Justice Gray enunciated the following rules and rationale:

The proper evidence of the decision of the jury is the verdict returned by them upon oath and affirmed in open court; it is essential to the freedom and independence of their deliberations that their discussions in the jury room should be kept secret and inviolable; and to admit the testimony of jurors to what took place there would create distrust, embarrassment and uncertainty.

\* \* \* \* \* \*

[W]e have not found any case since the beginning of this century in which, after the return and affirmance of a verdict in open court, the testimony of jurors to the motives and influences by which their deliberations were governed has been admitted.

\* \* \* \* \* \*

[T]he rule, which holds the deliberations of the jury room to be inviolable, and precludes jurors from giving evidence of their own misconduct, of the reasons and grounds of their determinations, and the motives which governed their conduct, [is a wise one.]

\* \* \* \* \* \*

It has long been settled law that the delivery of any paper by a party or his agent, designedly, and without the authority of the court, to the jury after they have retired to deliberate upon the case, will avoid a verdict in his favor, although the jury swear that they did not read it.

\* \* \* \* \* \*

But where evidence has been introduced tending to show that, without authority of law, but without any fault of either party or his agent, a paper was communicated to the jury, which might have influenced their minds, the testimony of the jurors is admissible to disprove that the paper was communicated to them, though not to show whether it did or did not influence their deliberations and decisions. A juryman may testify to any facts bearing upon the question of the existence of the disturbing influence, but he cannot be permitted to testify how far that influence operated upon his mind.

\* \* \* \* \* \*

Upon the same principle, where the cause which is alleged to have prevented a fair trial is misconduct or partiality on the part of a juror, and testimony of his acts or declarations outside the jury room has been introduced for that purpose, his testimony in direct denial or explanation of those facts is admissible. The statement of Mr. Justice Morton in *Dorr v. Fenno,* 12 Pick. 521, 525, that the testimony of jurors "may be received to explain or contradict other evidence tending to impeach their conduct," directly affirms this; but cannot, consistently with the judgments delivered by himself and other judges of this court in the cases already cited, be extended to allow the same or other jurors to testify to the part which they took, or the motives which influenced them, in their private deliberations.

*Woodward v. Leavitt, supra,* at 460, 461, 463, 466, 466, and 467.

During the 91 years since the Supreme Court adopted the rationale of this 112 year-old rule, its decisions have waivered but slightly from it.

Twenty-three years after the rule in *Mattox* was announced, Justice Lamar, when confronted with a motion for a new trial based upon affidavits from jurors alleging that when the jury retired each juror wrote down what he thought the plaintiff was entitled to recover and the aggregate of these amounts was then divided by the number of jurors to arrive at the monetary verdict, reiterated it on the Court's behalf. Noting, first, that the Supreme Court "recognize[s] the same public policy which has been declared by that court [North Carolina's], by those in England, and most of the American states," Justice Lamar, continued that:

For while by statute in a few jurisdictions, and by decisions in others, the affidavit of a juror may be received to prove misconduct of himself and his fellows, the weight of authority is that a juror cannot impeach his own verdict. The rule is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils. When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what had happened in the jury room.

These two conflicting considerations are illustrated in the present case. If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their verdict, and the defendant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify in a proceeding to set aside the verdict. But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and

many would be, followed by inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harrassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

*McDonald v. Pless,* 238 U.S. 264, at 267–268, 35 S.Ct. 783, at 784, 59 L.Ed. 1300, at 1302 (1915).

While acknowledging that:

[I]t would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without "violating the plainest principles of justice,"

*Id.,* at 268–269, 35 S.Ct. at 785, 59 L.Ed. at 1302–1303;

Justice Lamar, nevertheless, concluded by citing:

what is unquestionably the general rule, that the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict.

Id., at 269, 35 S.Ct. at 785, 59 L.Ed. at 1303.

The most recent Supreme Court decision to touch upon the subject is *Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966).

Here, in a *per curiam* decision, the Court for the first and only time, specifically identified an example of the exception to the general rule against a losing party using the testimony of jurors to impeach a verdict, that it had alluded to in *McDonald v. Pless, supra;* to wit: "an instance in which the testimony of a juror cannot be excluded without violating the plainest principles of justice."

Via post-trial interviews of jurors conducted by Parker's wife, Parker learned that while on a public sidewalk a seques-

tered juror had overheard a court bailiff, who had been assigned to shepherd her and her fellow jurors, state to an alternate juror, "Oh that wicked fellow [petitioner], he is guilty." Additionally, Parker learned that under similar circumstances a second juror overheard the same bailiff say to a third, but unidentified, juror, "If there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it." *See Parker v. Gladden, supra,* at 363–366, 87 S.Ct. at 470–471, 17 L.Ed.2d at 422–424.

At a hearing on a petition for post-conviction relief, both of these jurors were permitted to testify as to what they overheard the bailiff say, and one was permitted to testify she was prejudiced by the statements.

Finding that the unauthorized statements of the bailiff (whose statements, since he was an officer of both the court and the state, may be presumed to carry great weight with a jury he had been shepherding for eight days and nights) amounted to "private talk" reaching the jury as an "outside influence," the Court concluded that Parker had effectively been deprived of his Sixth Amendment rights to confrontation and cross-examination. Finding, also, that the bailiff's unauthorized conduct created such a probability of resulting prejudice that it inherently lacked due process, the Court set aside the jury verdict.

The briefest of analyses reveals that both these post-*Mattox* Supreme Court decisions are in complete accord with both the *Woodward* rule and its rationale.

The parallels between (1) allowing particular jurors to testify in explanation and rebuttal to allegations charging that they had formulated and expressed opinions as to proper verdicts in cases prior to the actual trial of such cases, as in *Woodward,* and (2) allowing particular jurors to testify concerning the effects upon them, personally, of (a) papers inadvertently communicated to them during deliberations as referenced in *Woodward,* (b) statements orally communicated to them during deliberations by non-jurors as in *Parker,* and (c) newspapers inadvertently communicated to them and statements orally communicated to them by non-jurors during deliberations in *Mattox,* are obvious. No such testimony is in any way prohibited by the *Woodward/Mattox* rule. Yet, each qualifies as a specific example of those instances, under which, contrary to the general rule, the testimony of a juror may be used to impeach his own verdict, that were alluded to by *McDonald.*

Although additional examples of instances in which the testimony of jurors may be used to impeach verdicts have subsequently been identified by the Federal Circuit Courts, the *Woodward* rule against permitting jurors to testify concerning personal or intra-jury conduct and mental processes occurring during deliberations remains inviolable.

In 1976, the United States Court of Appeals, D.C.Cir., using the language of *Mattox's* restatement of the *Woodward* rule, attempted to contrast those instances in which jurors have been permitted to impeach their own verdict because their testimony pertained to "extraneous influences," from those instances in which they were not:

> "Extraneous influence" has been construed to cover publicity received and discussed in the jury room, consideration by the jury of evidence not admitted into court, and communications or other contact between jurors and third persons, including contacts with the trial judge outside the presence of the defendant and his counsel. By contrast, evidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception and is not competent to impeach a verdict.

*United States v. Wilson,* 534 F.2d 375, at 378–379 (D.C.Cir.1976).

A very recent interpretation of the meaning of Fed.R.Evid. 606(b) by the United States Court of Appeals, D.C.Cir., reveals no discernible modification of the language or rationale of the Rule originally announced in *Woodward:*

[I]t is the established rule that a juror's testimony or affidavit "concerning his mental processes in connection ... with [a] verdict" is inadmissible and *may not be used* to support a collateral attack upon such verdict.

\*　　\*　　\*　　\*　　\*　　\*

While the courts have accepted the testimony of jurors to the effect that improper outside influences were brought to bear on the jury, "They have consistently refused to consider statements by jurors relating either to the subjective effect such influence might have had on them or to the mental processes through which they arrived at their verdict." Consequently, where "[t]he only questions that the trial judge might have asked at a hearing would have concerned the jurors' prejudices and, therefore, would have been impermissible, the trial court was under no obligation to conduct an evidentiary hearing.

\*　　\*　　\*　　\*　　\*　　\*

The purpose of the provisions in Rule 606(b) governing inquiry into jury deliberations, like that of the deliberate-concealment rule governing inquiry into jurors' responses on voir dire, is to preserve the integrity of jury deliberations by confining claims of error to events or conditions that are "improperly brought to the jury's attention" and involve a calculated intentional attempt to affect the outcome. As the present case well illustrates, the rule which generally prevents jurors from impeaching their verdicts is necessary in order to prevent "tampering with individual jurors subsequent to the verdict," and to sustain that "[p]ublic policy [which] forbids that a matter resting in the personal consciousness [much less subconsciousness] of one juror should be received to overthrow the verdict." "[A] change in the rule 'would open the door to the most pernicious arts and tampering with jurors.' 'The practice would be replete with dangerous consequences.' 'It would lead to the grossest fraud and abuse' and 'no verdict would be safe.'" [Citations and footnotes deleted.] [Emphasis in original.]

*United States v. Brooks*, 677 F.2d 907, at 912, 913, 913–914 (D.C.Cir.1982).

As summarized by Chief Judge Alaimo in the most recent pronouncement by a federal court on the current meaning and. purposes of Fed.R.Evid. 606(b):

> Since the 19th Century, the established rule regarding a juror's competence to attack a verdict is that "a juryman may testify to any facts bearing upon the question of the existence of any *extraneous influence,* although not as to how far that influence operated upon his mind." The rule represents a compromise . . . . . [by] accord[ing] deference to those important policy considerations which commend an inviolate jury process—(a) the protection of jurors against annoyance and harassment by losing parties; (b) the encouragement of free and open discussion among jurors; (c) the reduction of incentives for jury tampering; and (d) the promotion of finality in a jury's verdict.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> *Intrinsic influence upon a jury's verdict, therefore, are not grounds upon which to overturn a verdict, and a juror is not competent to testify about such matters. Intrinsic influences include "discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict."* [Emphasis, other than that of the last paragraph, which has been added, existed in original.] [Citations omitted.]

*United States v. Blackston,* 547 F.Supp. 1200, at 1217, 1217–1218 (D.C.S.D.Ga.1982).

The history of Fed.R.Evid. 606(b), then, rather than lending any support to the assertion of the Drafters' Analysis to Mil.R. Evid. 606(b) that the military rule is designed to allow jury impeachment of verdicts, by permitting jurors to testify as to improper intra-jury exercises of rank by senior jurors to sway junior ones, repeatedly cautions that the admission of any such testimony (testimony relating to intra-jury exercises of influence among the jurors themselves) for verdict impeachment pur-

poses, might well undermine the effective operation of the jury system, itself.

Turning to a historical review of the military case law on this subject, we begin by examining the only decision that could possibly be cited as support for the expansive view of the "command influence" exception that the Drafters' Analysis attributes to Mil.R.Evid. 606(b).

In *United States v. Conners,* 23 C.M.R. 636 (A.B.R.1957), the Army board of review received a record of trial containing:

> ... affidavits to the effect that when the court was deliberating on the sentence an opinion was expressed by one of the ranking members that an excessive sentence could or should be given, so that the convening authority might exercise his powers of clemency.

*Id.,* at 640.

Noting that "there is a general rule that a juror will not be permitted to impeach its verdict by a subsequent affidavit," the *Conners'* board, nevertheless, accepted and considered the affidavits. It did so because:

> ... the use of military rank as an element in deciding the sentence is analogous to "command influence", one of the chief evils or weaknesses of the court-martial system which the drafters of the *Code* sought to correct.

*Id.,* at 640.

It justified its decision ordering a rehearing as to sentencing by asserting that:

> If court-martial proceedings are to receive the respect and confidence of Congress, the civilian bar, and the public generally, they must be free of any "appearance of evil", particularly with regard to this area of "command control".

*Id.,* at 641.

Interestingly, despite the language of this case, its holding with respect to entering

jury deliberation rooms via affidavits has been cited only once during the twenty-five years that have ensued its publication. In *United States v. Thompson,* 32 C.M.R. 776 (A.B.R.1962), the Army board referenced *Conners* as an example of the exception to the fundamental rule against permitting the testimony of jurors to impeach their own verdicts when such testimony relates to their exposure to *extraneous* influences that was hypothetically alluded to by the Court of Military Appeals in *United States v. Bourchier,* 5 U.S.C.M.A. 15, 17 C.M.R. 15 (1954). The context of the Army board's reference to *Conners* in *Thompson* seems to imply that it was the extraneous influence of the subject matter of the ranking member's remarks (i.e. rendering a severe sentence to allow the convening authority the exercise of discretion in reducing it) that dictated the *Conners* holding, rather than any exercise by the member, himself, of influence based upon his own rank.

Having concluded that the *Conners* decision is currently devoid of decisional value, we next demonstrate the actual status of pre-Mil.R.Evid. 606(b) military law pertaining to the instant subject, by quoting from the extensive survey of this law that was conducted by the Army Court of Military Review in *United States v. Perez-Pagan,* 47 C.M.R. 719 (A.C.M.R.1973).[12] There, the Army court was confronted with an affidavit submitted by a juror which alleged that during jury deliberations:

> ... four ballots were taken in closed session and that no "secret written ballots" on the question of reconsideration were taken.

*Id.,* at 720.

After reviewing three military,[13] and four

---

12. The sole military case dealing with impeachment of jury verdicts decided during the period that intervened between the decision in *United States v. Perez-Pagan,* 47 C.M.R. 719 (A.C.M.R. 1973) and the implementation date of Mil.R. Evid. 606(b), *United States v. Higdon,* 2 M.J. 445 (A.C.M.R.1975), based its holding upon the same Court's earlier "reexamination and reaffirmation" of existing case law in *Perez-Pagan.*

13. *United States v. Bourchier,* 5 U.S.C.M.A. 15, 17 C.M.R. 15 (1954), refusing to consider facts in affidavit from a third party to whom a juror had related deliberation room exercise of "command influence;" *United States v. Thompson,* 32 C.M.R. 776 (A.B.R.1962), considering facts in affidavit from juror that related deliberation room consideration of extraneous matter relat-

civilian[14] cases dealing with such affidavits, the *Perez-Pagan* court decided against considering the juror's affidavit for purposes of impeaching the trial court's verdict. It did so because:

> The posture of ... federal law on this subject ... remains that a juror's testimony whether by affidavit or on the witness stand will be declared incompetent to substantiate any attempt to overthrow the process by which the jury arrived at the verdict. Such facts as argument of a juror, influence of a juror upon another juror, unsound reasoning exhibited by a juror, misconception of the evidence, consideration of improper matters, and a misapplication of the law will not be considered as competent testimony from a juror. It is only when [1] *extraneous prejudicial information* was improperly *brought before the jury* or [2] any *outside influence* was improperly *brought to bear on a juror* that the courts will interfere. [Citations omitted.] [Emphasis added.]

*United States v. Perez-Pagan, supra,* at 722.

In stark contrast to the justification offered by its predecessor Board of Review in *Conners,* the Army Court's policy justification for this decision indicated that:

> [W]e are not unmindful that there is no adequate procedure now at hand to insure compliance with the provisions of paragraph 74*d*(3), *Manual, supra,* unless the military judge commits the instructional error found in [*United States v. Boland,* 20 U.S.C.M.A. 83, 42 C.M.R. 275 (1970)]... However, of overriding concern to us is the importance of preserving the sanctity of jury deliberations in closed session by keeping them beyond the pale of all but limited judicial examination.

To adopt a procedure of accepting affidavits from court members, as in the instant case, would cause a plethora of collateral issues and bog down the orderly process of judicial proceedings. It would fling open the doors to the jury room for examination and present to defense counsel the tempting opportunity to pursue and solicit from court members all manner of affidavits as to events and discussions that transpired within the jury room. With the exception of "outside prejudicial information brought before the jury" or "extraneous influences upon the court," we believe that the doors to the jury room should be closed to all but those who participated in deliberations.

*United States v. Perez-Pagan, supra,* at 722–723.

Nor has military *stare decisis* regarding such matters changed since Mil.R.Evid. 606(b) was implemented into military practice on 1 September 1980. Of the three cases interpreting Mil.R.Evid. 606(b) since that date, two dealt with affidavits from jurors admitting unauthorized visits to the crime scene and the third dealt with affidavits from a majority of a court panel's members indicating that they believed the accused should have been found not guilty, rather than guilty as their verdict indicated.

The dicta of all three of these cases indicates a general belief that Mil.R.Evid. 606(b) effected no change in the previously existing military law on the subject, *United States v. Bishop,* 11 M.J. 7, at 8–9 (C.M.A. 1981); *United States v. Witherspoon,* 12 M.J. 588, at 589–590 (A.C.M.R.1981); *United States v. Hance,* 10 M.J. 622, at 624 (A.C.M.R.1980). The strict holdings of the

---

ing to conviction and sentencing of accused's co-actor in nearly all charged offenses to order resentencing hearing; and *United States v. Harris,* 32 C.M.R. 878 (A.F.B.R.1962), refusing to consider facts in affidavit from the accused which related that he had overheard jurors while in deliberation room indicate that quantum of punishment would be decided by a flip of the coin.

14. *McDonald v. Pless,* 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915), affidavit of juror not accepted, though facts, if true, demonstrated

arbitrary and unjust method of arriving at verdict; *Mattox v. United States, supra,* affidavits of jurors accepted to show a newspaper was brought into deliberation room; *Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), affidavit of juror accepted to show prejudicial remark made to jury by bailiff; and *United States ex rel. DeLucia v. McMann,* 373 F.2d 759 (2d Cir.1967), affidavits of jurors accepted to disclose an unauthorized juror's visit to the scene of the crime.

first two cases were obviously limited to declaring the testimony of jurors concerning matters bearing directly upon the "whether extraneous prejudicial information was improperly brought to the attention of the members of the court-martial" exception of Mil.R.Evid. 606(b) to be competent, *United States v. Bishop, supra,* at 8–9 (C.M.A.1981) and *United States v. Witherspoon, supra,* at 589–590 (A.C.M.R.1981). The strict holding of the third declared juror testimony to be incompetent under the Rule unless relating to matters "where extraneous prejudicial information was improperly before the jury or where outside influences were improperly brought to bear on the jury." *United States v. Hance, supra,* at 624 (quoting from the pre-Mil.R. Evid. 606(b) case of *United States v. Higdon,* 2 M.J. 445 (A.C.M.R.1975)).

According to Judge Fletcher, speaking for a unanimous Court of Military Appeals in its only consideration of Mil.R.Evid. 606(b) to date:

> The general rule calling for strict nonimpeachability of a jury's verdict protects freedom of deliberation as well as the stability and finality of verdicts, while protecting jurors from annoyance and embarrassment. *McDonald v. Pless,* 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). However, as the foregoing Military Rule of Evidence [Mil.R.Evid. 606(b) ] suggests, *all* verdicts are not beyond effective examination. Testimony may be received from the jurors regarding external extraneous influences bearing on their deliberative process. *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892). *See Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). Furthermore, as Mil.R.Evid. 606(b) explicitly states, testimony of court members may be received "on . . . whether extraneous prejudicial information was improperly brought to . . . [their] attention."

It is evident that Mil.R.Evid. 606(b) is entirely consistent with our opinion in *United States v. West,* 23 U.S.C.M.A. 77, 48 C.M.R. 548 (1974). There, Judge Duncan found that an affidavit of a court member could not be considered to support an attack on the sentence by disclosing that the court, contrary to instructions, used erroneous procedures during deliberations. His conclusion was "that the great weight of authority is that a verdict cannot be impeached by a member of the jury who claims that the jury failed to follow the court's procedural or substantive instructions." *Id.* at 81, 48 C.M.R. at 552.

> The affidavit in that case concerned deliberative procedures traditionally preserved inviolate under the general rule of nonimpeachment. However, the subject matter of the present affidavits compels us, under the exception detailed in Mil.R. Evid. 606(b), to examine alleged external influences on the jury's deliberation.

*United States v. Bishop, supra,* at 9.

Having concluded our examination of existing case law on this subject, we are convinced that we should not effectuate the interpretation of Mil.R.Evid. 606(b) suggested by the drafters' analysis appended thereto. We base this conclusion upon our belief that the expansive definition of the term "command influence" embraced by this drafters' analysis would significantly impede the ability of any jury system, be it civilian or military, to function both efficiently and effectively.

■ Pragmatically, any gains achieved by the drafters' expansive definition of the term "command influence" as used in the Rule would be minimal, at best. First, to our knowledge, the very suggestion that a senior court member might attempt to employ his rank to command a junior member of a court panel either to vote in a particular manner or to remain silent during deliberative discussion, is virtually unknown in the United States Air Force. And, second, we are unaware of any expression of legislative concern (such as is alluded to by the drafters) regarding the potential for an exercise of rank in a jury room, *vis a vis,* an exercise of outside influence upon jury members imposed by particular commanders who would ordinarily be responsible for

sending particular individuals to trial. *See,* Article 37(a), U.C.M.J., 10 U.S.C. § 837(a).

The danger (to wit: allowing jurors to impeach their own verdicts by testifying as to intrinsic "intra-jury influences" exercised upon them during jury deliberations), inherently lying in such an expansive definition of the term, has, on the other hand, been repeatedly recognized by this nation's federal courts ever since their inception.

Consequently, it is plainly evident to us that were we to interpret this rule in accordance with the interpretation suggested by its drafters, in exchange for little or no gain, we could well open wide the door that has protected finality of jury verdicts against allegations of improper exertions of intra-jury influences since the time that jury trials were first conceived. In fact, such a wide assortment of allegations might become competent bases for inquiry under the interpretation suggested by the drafters, that the very underpinnings of the military's jury system could well be endangered.

In our opinion, the affidavit that we view today meets no judicially recognized exception that is either specified in Fed.R.Evid. 606(b) or in Mil.R.Evid. 606(b) to the general prohibitions each proclaims against allowing jurors to impeach their own verdicts.

Believing that when fundamental principles of law, developed by centuries of remarkably consistent *stare decisis,* are finally codified, this Court should interpret the language of that codification in a manner consistent with the fundamental historical principles upon which it is based, we reject any language contained in the Drafters' Analysis that attributes meanings to Mil.R. Evid. 606(b) which are inconsistent with the clear principles expounded by the three centuries of unwaivering *stare decisis* we have here reviewed today.

Ergo, we determine that the instant affidavit is from a person, who by virtue of Mil.R.Evid. 606(b), is incompetent to present the type of evidence purportedly contained therein. Hence, we reject the affidavit and do not further consider the possible merits of its contents.

Having examined the entire record of trial, each error assigned or asserted by either trial or appellate defense counsel, and the Government's response to each error so assigned or asserted, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the accused was committed.

Accordingly, the findings of guilty and the sentence are

AFFIRMED.

HODGSON, Chief Judge (concurring in part and dissenting in part):

My disagreement with Judge Miller's opinion lies in his conclusion that Dugan possessed sufficient knowledge to identify a "rock-like substance, light beige in color" as cocaine. Dugan stated that he had no experience with cocaine prior to his encounter with the accused and her husband, John. He further indicated he thought the substance was cocaine because John said it was, and because it "numbed" his nose and tongue and gave him a "rush." This latter physiological reaction could also be obtained from non-controlled drugs that were available in the MacDill area. I am aware that an accused's contemporaneous declaration as to the nature of the substance is a proper evidence of its identity, *United States v. Weinstein,* 19 U.S.C.M.A. 29, 41 C.M.R. 29 (1969), but here the declaration was made by a third party and not the accused. Further, John Accordino's qualifications to identify cocaine were not in evidence. *See* Mil.R.Evid. 701 and 702. Indeed, Dugan's total experience with "cocaine" was limited to times during July and August when John Accordino provided the substance. I find the following direct examination of Dugan to be pertinent:

Q: What did they tell you it was, if anyone told you that the substance was something?

A: Cocaine.

Q: Who told you?

A: *No one specifically, I guess, just, you know, its cocaine, you know.* [Emphasis supplied.]

In my view, neither the facts of this case nor Dugan's testimony are sufficient to sustain a conviction for the wrongful use of cocaine. *See United States v. Courts,* 4 M.J. 518 (C.G.C.M.R.1977) (witness was a cocaine user, knew how to administer it, what it looked like, and where and how to buy it as well as to cut or dilute it.) I would affirm the lesser included offense of attempted wrongful use of cocaine, in violation of Article 80, U.C.M.J. *See United States v. Foster,* 14 M.J. 246 (C.M.A.1982); *United States v. Bruce,* 14 M.J. 254 (C.M.A. 1982); *United States v. Newak,* 15 M.J. 541 (A.F.C.M.R.1982). In either situation the approved sentence is appropriate.

I concur in the result reached in Parts I, III, and IV of Judge Miller's thoughtful opinion.

HEMINGWAY, Senior Judge (concurring in the result):

I agree with the reasoning and results reached in parts I, II, and III of the principal opinion. While I concur in the result reached in part IV of Judge Miller's opinion, I would consider the affidavit submitted by appellate defense counsel but find that there has been no demonstration of improper command influence. I agree with the Drafters' Analysis of Rule 606(b) that "use of superior rank or grade by one member of a court to sway other members would constitute unlawful command influence for purposes of this Rule..." However, in this case the president of the court merely called for a vote at a time when, as the court member's affidavit admits, the majority of the members were ready to vote. The affidavit does not suggest that any improper command influence was injected in the deliberations. Judge Miller expresses a fear that some legal poltergeist will threaten the underpinnings of the jury system if we consider affidavits such as the one submitted in this case. I perceive no such danger.