UNITED STATES, Appellee,

v.

**Kenneth L. BISHOP, Staff Sergeant, U. S. Air Force, Appellant.**

No. 38,397.

ACM 22505.

U. S. Court of Military Appeals.

April 27, 1981.

For Appellant: *Major Robert G. Gibson, Jr.* (argued); *Colonel Larry G. Stephens, John A. Everhard, Esq.* (on brief).

For Appellee: *Captain Richard O. Ely, II* (argued); *Colonel James P. Porter, Captain James R. Van Orsdol* (on brief).

Opinion of the Court

FLETCHER, Judge:

The appellant was convicted by a general court-martial with members of both rape and burglary.[1] We have reviewed this case to determine whether certain personal knowledge on the part of some jurors impeached the court members' verdict of guilty.[2] After consideration of the arguments and facts before us, we answer the contested legal issue in the negative and affirm the decision of the United States Air Force Court of Military Review.

A

WHETHER UNAUTHORIZED VIEWS OF THE SCENE OF THE CRIME BY SOME COURT MEMBERS WAS ERROR *PER SE.*

B

WHETHER THE COURT MEMBERS FAILED TO NOTIFY THE MILITARY JUDGE OF THEIR PERSONAL KNOWLEDGE OF THE FACTS AND CIRCUMSTANCES OF THE OFFENSES [WHICH THEY CONSIDERED IN THEIR FINDINGS DELIBERATIONS].

---

1. Appellant was found guilty of rape and burglary, in violation of Articles 120 and 129, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 929, respectively. The approved sentence included confinement at hard labor for 3 years, a dishonorable discharge, and reduction to the lowest enlisted grade.

2. The legal issue granted (9 M.J. 7, 8) was composed of two subdivisions:

A brief recital of the facts helps elucidate the issue. The victim of these offenses lived in base housing next door to the appellant. On the evening of the incident she and her daughter were at home and her husband was absent. After retiring for the evening, the victim heard noises in the house and, thinking it was her husband, called out his name. She received no answer and called out to her daughter. Suddenly, a tall thin man came up the stairs and entered her bedroom. While grabbing her around the mouth, the assailant said, "Don't scream and I won't have to tie you or gag you." She immediately recognized the voice as being that of her neighbor. Her first action was to say something about money and direct the intruder to her purse. But this did not distract him, as he tied her hands and proceeded to rape her. During this time no lights were on in the house. However, two pole lights outside provided sufficient illumination for her to identify her assailant.

As he was leaving the apartment, her attacker told her to be quiet. Shortly thereafter, the victim managed to free herself and call the security police. She explained that her failure to name the appellant as her assailant at that time was due to her perception that her attacker's hair was darker than her neighbor's. She did describe her attacker as being like her neighbor, Ken.

On the following evening, the appellant and his wife were outdoors on a swing set. The victim's husband, seizing the opportunity to view the appellant in the dark, encouraged her to peer out a bedroom window. She did so, and positively identified her neighbor as her assailant.

The primary issue at trial in the case at bar was the victim's identification of the accused as the perpetrator of the offense. There was considerable litigation concerning whether lighting conditions around the victim's house allowed her to view the accused's face during the rape. Furthermore, there was controversy over the amount of noise and commotion within the neighborhood resulting from the victim's report of the offense.

The accused, testifying on his own behalf, asserted that on the evening in question, he and his wife had gone to a softball game and after returning, mid-evening, retired shortly after 10:00 p. m. Other than one trip to the bathroom, he and his wife remained in bed all evening. Neither was aware of any commotion next door during the course of the night. The testimony of his wife substantiated this.

■■ Appellant urges that various affidavits filed after trial demonstrate that improper extraneous information was before the members and impeached their verdict. Among these are several from the court members. We turn first to the question of whether our consideration of such affidavits is proper. This is clearly answered by Mil. R.Evid. 606(b),[3] allowing inquiry into whether extraneous prejudicial information was improperly brought to the jury's attention. This rule was adopted from the corresponding Federal Rule of Evidence.[4] It provides:

(b) *Inquiry into validity of findings or sentence.* Upon an inquiry into the validity of the findings or sentence, a member

---

3. The Military Rules of Evidence "apply to all court-martial processes taken on or after" September 1, 1980. Executive Order 12198, March 12, 1980, Part C. The affidavits in question were executed on various dates after January 25, 1979, but before the effective date of the Military Rules of Evidence. This need not detain us, however, as we believe the principle allowing consideration of affidavits alleging extraneous prejudicial information is in complete accord with the law of this Court, Fed.R.Evid. 606(b) then in effect, and with the weight of federal law generally. Furthermore, this prin-

ciple does not contravene any rule of evidence in the applicable Manual for Courts-Martial, Executive Order, or regulation.

4. It differs in that a change in title "reflect[s] the sentencing function of [court-martial] members." Additionally, a reference to "unlawful command influence ... is required by the need to keep proceedings free from any taint of unlawful command influence and further implements Article 37(a) of the Uniform Code of Military Justice." Analysis to Mil.R.Evid. 606(b).

may not testify as to any matter or statement occurring during the course of the deliberations of the members of the court-martial or to the effect of anything upon the member's or any other member's mind or emotions as influencing the member to assent to or dissent from the findings or sentence or concerning the member's mental process in connection therewith, except that a member may testify on the question whether extraneous prejudicial information was improperly brought to the attention of the members of the court-martial, whether any outside influence was improperly brought to bear upon any member, or whether there was unlawful command influence. Nor may the member's affidavit or evidence of any statement by the member concerning a matter about which the member would be precluded from testifying be received for these purposes.

The general rule calling for strict nonimpeachability of a jury's verdict protects freedom of deliberation as well as the stability and finality of verdicts, while protecting jurors from annoyance and embarrassment. *McDonald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). However, as the foregoing Military Rule of Evidence suggests, *all* verdicts are not beyond effective examination. Testimony may be received from the jurors regarding external extraneous influences bearing on their deliberative process. *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892). *See Parker v. Gladdin*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). Furthermore, as Mil.R.Evid. 606(b) explicitly states, testimony of court members may be received "on . . . whether extraneous prejudicial information was improperly brought to . . . [their] attention."

It is evident that Mil.R.Evid. 606(b) is entirely consistent with our opinion in *United States v. West*, 23 U.S.C.M.A. 77, 48 C.M.R. 548 (1974). There, Judge Duncan found that an affidavit of a court member could not be considered to support an attack on the sentence by disclosing that the court, contrary to instructions, used erroneous procedures during deliberations. His con-

clusion was "that the great weight of authority is that a verdict cannot be impeached by a member of the jury who claims that the jury failed to follow the court's procedural or substantive instructions." *Id.* at 81, 48 C.M.R. at 552.

The affidavit in that case concerned deliberative procedures traditionally preserved inviolate under the general rule of nonimpeachment. However, the subject matter of the present affidavits compels us, under the exception detailed in Mil.R.Evid. 606(b), to examine alleged external influences on the jury's deliberations.

█ We now turn to an evaluation of the allegations in these properly considered affidavits. It seems that several of the court members resided in the same housing area with the appellant. One of them, Major Reitinger, filed an affidavit after trial stating that during the deliberations several members indicated "that they were awakened by [police] noise" the evening of the incident. Also, according to this account, three court members examined the "rear of [the victim's] house" to determine "the amount of light present" there.

Subsequent to this first affidavit, government counsel secured affidavits from each court member. In his second affidavit, Major Reitinger asserts that he had previously misrepresented his fellow members' actions; that "no planned" visit was made to the scene, but that only one member did so, looking only from his moving automobile. Others recalled that any discussion of the residence occurred only after the vote on findings. Major Reitinger could not recall when it was discussed. Colonel Cusik recalled hearing the police noise and calling the fire department in his role as fire marshal. He was told that "it was a security police response." Several other members recall passing the house on the way to work. Major Anderson in particular recalls that he and one other member individually passed by the home in transit, but he concluded that because snow was on the ground, it was impossible to determine the outside lighting condition of the victim's dwelling.

It is clear that Major Reitinger's second affidavit and those of the other members refute the suggestion that any court member deliberately proceeded to the scene of the crime in an attempt to verify the lighting conditions of that location. The affidavits of Colonel Cusik, Lieutenant Colonel Doherty, Lieutenant Colonel Buriff, Lieutenant Colonel Gray, Major Anderson, Captain Harrison, and Captain O'Donnell do indicate that one or more of the court members may have been familiar with the area and the lighting at night because their homes were nearby and they passed through the neighborhood. Such a casual or fortuitous view is considerably different from a deliberate act of seeking out the scene of the crime for the purpose of making observations to be used in determining issues at trials. Furthermore, the affidavits indicate that there was no discussion of the impact of the police noise—such personally known by certain members residing in the neighborhood—on the credibility of the testimony of appellant and his wife.

Therefore, a fair reading of the affidavits before us, does not show that the personal familiarity of the members had any effect whatever on their deliberations or decision in this case. *United States v. Wolfe*, 8 U.S.C.M.A. 247, 24 C.M.R. 57 (1957). We cannot, therefore, extract from these affidavits any evidence that the court members violated the military judge's instruction to consider in their deliberations only evidence admitted in open court. As there was no prejudicial extraneous information injected into their deliberations there is no reason in law or logic to reverse the lower court's decision.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT and Judge COOK concur.