**34**

UNITED STATES, Appellee,

v.

**Quince L. EVANS, Seaman Apprentice, U.S. Navy, Appellant.**

No. 52,097.
NMCM No. 84 2764.

U.S. Court of Military Appeals.

Sept. 28, 1988.

Certiorari Denied Jan. 9, 1989.
See 109 S.Ct. 797.

For Appellant: *Lieutenant J. Cunyon Gordon*, JAGC, USN (on brief); *Commander David C. Larson*, JAGC, USN.

For Appellee: *Captain Carl H. Horst*, JAGC, USN, *Lieutenant J.K. Ianno*, JAGC, USNR, *Lieutenant Brian S. Saunders*, JAGC, USNR (on brief); *Captain W.J. Hughes*, JAGC, USN.

*Opinion of the Court*

EVERETT, Chief Judge:

Contrary to his pleas, Evans was convicted by a general court-martial composed of officer members of unauthorized absence, larceny, two robberies, forgery of a Treasury check, five assaults with intent to rob, and communication of a threat, in violation of Articles 86, 121, 122, 123, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 921, 922, 923, and 934, respectively. The sentence adjudged by the members was a dishonorable discharge, confinement for 30 months, forfeiture of $450.00 pay per month for 30 months, and reduction to pay grade E-1. The convening authority approved these results, and the Court of Military Review affirmed in a short-form opinion. We granted appellant's petition for review to consider:

> WHETHER THE MILITARY JUDGE ERRED TO THE MATERIAL PREJUDICE OF SUBSTANTIAL RIGHTS OF APPELLANT WHEN HE DENIED DEFENSE'S MOTION FOR MISTRIAL AFTER THE MEMBERS HEARD INADMISSIBLE EVIDENCE OF AN OUT–

OF–COURT IDENTIFICATION OF APPELLANT.

I

The robbery and assault charges against Evans involved an armed robbery at the Naval Regional Medical Center in Oakland, California, during which two masked men took cash and drugs. In summarizing the Government's evidence during his opening statement to the court members, trial counsel informed them that various witnesses would testify to the circumstances of the robbery; that other witnesses would place appellant with one John Hill shortly before and soon after the robbery; and that Hill would testify that he and appellant perpetrated the armed robbery. Trial counsel prepared the court members to hear

certain things that are ... not too good about Mr. Hill. Now, he will tell you that he is a convicted felon and that for these robbery charges and these assault charges he went to a general court-martial in April of 1982 and was convicted. He will also tell you that he agreed to testify against SA Evans as a result of a pretrial agreement, in that he would receive lesser punishment than could be awarded or that the punishment would be limited to 18 months' confinement at hard labor instead of whatever the judge or the jury would have awarded him and that his testimony against SA Evans, initially in an Article 32 Investigation, was done so—was prompted by the promises made that he would receive a reduced sentence.

Then you will also hear that HM Hill was a cocaine addict. The reason that he planned the robbery of the hospital was that he was out of money, had no money to buy cocaine, and that he felt that since the hospital did use cocaine in their ear, nose, and throat treatments that he could obtain that and continue getting his high.

Later in his opening statement trial counsel asserted:

And finally, you will also hear testimony that an individual by the name of Karen Cobb identified SA Evans as being at her

brother's apartment—Preston Cobb's apartment—approximately two days after the robbery and that she saw him in a back alley outside of her apartment place a black bag with a long strap in some bushes and that the next day when the FBI contacted her she took them to the spot where the FBI Agent, John Schmitz, who will be here to testify, found a Bell and Howell black camera case with a long black strap and in it the valium, the cocaine, and the morphine taken from the hospital.

During the Government's case-in-chief, four victims of the robbery described the circumstances; but they could only identify the perpetrators as two black males around 5′11″ and 5′7″ in height. Thereafter, trial counsel announced that he intended to call, as a witness, Special Agent John Schmitz of the FBI. At this point, appellant's civilian counsel asked for an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session and then explained to the military judge that it was his

understanding that Karen Cobb was going to testify as to the identification of the accused a couple of days after the alleged robbery. And after talking with LT Downing [trial counsel] just now, it's my understanding that Agent Schmitz may testify that he showed a picture of the accused to Karen Cobb ... who allegedly will testify that she saw the accused a couple days subsequent to the alleged robbery throw the black camera case, which had been taken from LCDR Marine [one of the victims], into the bushes and it was subsequently retrieved by the FBI.

Civilian defense counsel expressed concern that exhibiting the picture to Ms. Cobb when she made the identification had been "unnecessarily suggestive," so that her identification might itself be subject to suppression under Mil.R.Evid. 321(d)(2). This colloquy ensued:

TC: The only thing that the agent will testify to is where he found these items, first of all.

IC: We have no objection to that.

TC: And secondly, he will simply identify what he showed Karen Cobb ... it's simply a copy of a driver's license. So, all he will do is identify the exhibit as being that prepared by him to show to Karen Cobb. He is not going to testify as to what Karen Cobb said. Karen Cobb will be here in person to do that.

MJ: Well, what was the sequence of her identification of the accused—how was it she came to say that this accused was the individual she saw throwing the bag away? Was it after the agent showed this to her and said, "Is this the fellow you saw?"

IC: Yes, sir.

MJ: And you're saying that this should be excluded because it—

IC: Unnecessarily suggestive out-of-court ID.

After further discussion, the judge ruled that

based on the requirement of the agent for the witness to provide a description and the witness' stated belief that she would be able to identify the individual the court does not find that the showing of a single photograph is unnecessarily suggestive. If, however, you wish to explore with the witness' cross-examination as a matter of weight the validity of the identification then you are at liberty to do so.

Mr. Schmitz then testified that, as a result of an anonymous call, he had interviewed Karen Cobb, who lived in an apartment on Trask Street in Oakland, California. She told him that she had observed someone "take ... a package of some kind, and put it in some bushes along Trask Street." Schmitz then identified a "camera case which" he had "found in the bushes next to the apartment where Karen Cobb pointed." Schmitz next identified "a copy of a California driver's license for a Quince Lee Evans," which he had shown to Karen Cobb during the interview. His purpose was "[t]o determine if she could identify this individual as being the individual that she observed putting the item that she said she saw into the bushes."

On cross-examination, Schmitz conceded that, according to Ms. Cobb, she had had a very limited opportunity to observe the person who had thrown the package into the bushes. The final questions and answers during cross-examination were these:

Q: And you showed her the picture of the accused and asked her if this was the person who was there, isn't that right?

A: Yes.

Q: And after you showed her the picture she said, "Yes, it is," isn't that correct?"

A: Yes.

Q: She did not volunteer his name, isn't that right?

A: No.

There was no redirect.

The next two witnesses testified that Evans and another servicemember, John Hill, had been near the Medical Center at about 11:30 p.m.—shortly before the robbery. In turn, Hill, who had already been convicted for the robbery and had served his sentence to confinement of 18 months, identified appellant as his accomplice. During cross-examination, Hill admitted that, although he had been urged to name appellant as the other robber, he originally intended to identify someone else. However, in order to obtain a favorable pretrial agreement, he finally had stated that Evans was the other robber. Hill insisted, however, that his identification of appellant as his accomplice was accurate.

Ultimately, the Government rested its case-in-chief without calling Karen Cobb to the stand, whereupon the defense counsel stated:

[O]ne of the witnesses called by the Government, Agent Schmitz, of the FBI, testified that Evans was identified by a woman by the name of Karen Cobb as throwing the evidence that was introduced into some bushes. Upon questioning by the military judge, the trial counsel told the military judge that Karen Cobb would be called also. We had moved at that time to suppress the out of court identification as unnecessarily sug-

gested—suggest and it was denied by the military judge—that was denied by the military judge after representation by the trial counsel that Ms. Cobb would be called. Your Honor, it's our position that the testimony of Agent Schmitz is not admissible without Miss Cobb as hearsay under, I think, it's 801(d)lc. and 321, when the only time a witness can testify to the out of court identification of another witness is when the other witness is present in court for the purposes of cross-examination, and since the Government is resting, it is obvious that Ms. Cobb will not be called.

After trial counsel confirmed that he did not plan to call Miss Cobb, the defense moved for a mistrial; and the motion led to this colloquy:

MJ: Oh, well, realistically what would you like to have? Failing in that, what would you like to—

ICC: If that fails—

MJ: An instruction, perhaps, of some sort—

ICC: Well, I'd like the testimony of Agent Schmitz stricken.

MJ: Well, I'm not even sure what the Government's position is on this. What's the Government's position on his motion for a mistrial?

TC: The Government opposes that.

In turn, trial counsel pointed out that [t]he testimony from Mr. Schmitz was that he asked Karen Cobb whether she could identify the individual she saw, and that he showed her a picture which was admitted into evidence, and that he identified the picture as that being the one he showed her at that time. At that point the Government ceased direct examination and didn't elicit anything further with the full attention [sic] that Karen Cobb would be here. However, on cross-examination the last question the defense counsel asked was, "Well, and she identified the picture, isn't that right"?, and Mr. Smith [sic] said, "Yes." So, the Government did not elicit any evidence from Mr. Schmitz on the identity of the individual in the picture.

However, the defense counsel did through his own cross-examination, and he cannot now be—stand here and cry, foul, when through his own questioning he elicited the response which he now seeks to suppress as hearsay. So that's the Government's position is that the in court—or the statement of Mr. Schmitz should stand, given the fact that the individual who asked the question, was, in fact, the defense.

Had the Government asked the question, and the defense objected, on the grounds of hearsay, then not only would the military judge have instructed the members to disregard, but then the Government would have again, brought Miss Cobb in and had her testify as to the identity. So, the Government's position on it is that whatever—even though it may have been hearsay at the time, it was ... not objected to by Government counsel and the question was asked by the defense and now they ask to strike the whole testimony.

Civilian defense counsel replied that he had

bas[ed] the questioning on the representation of the trial counsel who is an officer of the court, that Miss Cobb would be called. He said that in response to the questioning of the military judge and ... [y]ou asked if Miss Cobb would be called. You said you assumed she would be called and the trial counsel said, yes. It's my understanding that what happened is that trial counsel intended to call Miss Cobb but she didn't show up.

Trial counsel in turn confirmed that Miss Cobb was not going to be produced, because "[i]t simply was determined that after that evidence came in through defense counsel, there was no need to call Miss Cobb."

The military judge then ruled that, because the questions by the defense had been asked in the belief that Miss Cobb would be called by the Government and "the special agent's testimony was, basically, foundational, and for the purpose of establishing the identity of the driver's li-

cense shown to Miss Cobb," the testimony by Schmitz about the identification should be stricken as hearsay. The judge asked trial counsel, "Do you want to try to get Miss Cobb to the trial today?" After receiving an affirmative answer, the judge denied the motion for mistrial.

After being allowed to address further his motion for mistrial, civilian defense counsel pointed to certain weaknesses in the Government's case and contended that, under the circumstances, "the testimony of the FBI agent is devastating to the defense case and is so prejudicial that it outweighs any probative value and cannot be cured by mere striking of the testimony and the retrieving of the driver's license." The judge then stated his opinion, "based on all the evidence presented in the case so far and the nature of this matter, that"—along with striking from evidence the driver's license which had been previously admitted —"an instruction to the members would be sufficient to cure any prejudice to the accused."

Following a brief recess to allow further opportunity for the Government to contact Miss Cobb, trial counsel announced that he would not call her. Soon thereafter—before the defense opened its case—the military judge instructed the members in this manner:

Okay, we have a preliminary item. If you recall, earlier in the trial there was testimony from an FBI agent named Schmitz. He gave testimony on an out-of-court identification of the accused by an individual named Karen Cobb, who basically identified the driver's license that was used for identification purposes. An identification by an individual like Karen Cobb outside of court needs to be testified to by Karen Cobb. That is hearsay if it's only testified to by somebody who happened to be present at the time. The testimony of Agent Schmitz was more or less, foundational. It was admitted into court only in anticipation that Karen Cobb would be called to actually give personal testimony about this identification. It develops that Karen Cobb is

not going to be called, and this, in effect, makes Agent Schmitz' testimony somewhat inadmissible, retroactively. Of course, you've heard the testimony. So all I can do at this point is tell you that you should not have heard the testimony. Having done so, I am going to instruct you to disregard the testimony. It's not always an easy thing to disregard something you heard. However, you can do it if you understand that in order for the accused to receive a fair trial, you simply must not consider any information testified to by Agent Schmitz. Let's proceed as though he did not give any testimony and do not utilize any of the information that he testified to. Do you have any questions about that?

The president of the court-martial answered in the negative; and trial continued on to findings and sentence.

## II

The testimony by FBI Agent Schmitz about Miss Cobb's identification of appellant clearly was hearsay and would have been inadmissible if offered by the Government. In light of the context in which defense counsel asked Schmitz about this identification during cross-examination, we fully agree with the defense argument and the military judge's ruling that the hearsay objection had not been waived and that Schmitz' testimony in this regard should be stricken.

Having determined to strike the hearsay testimony which identified Evans as one of the two robbers, the judge could properly have granted the defense motion for a mistrial. *See* para. 56*e* (1), Manual for Courts-Martial, United States, 1969 (Revised edition). In his opening statement, trial counsel had summarized the testimony that he said Miss Cobb would be giving; but then he had decided not to call her. The court members had heard the stricken testimony of Agent Schmitz. The principal evidence linking Evans to the crime was the testimony of Hill—a purported accomplice of poor credibility who was testifying in order to obtain the benefit of a pretrial agreement

in his own case. Therefore, the military judge could permissibly have concluded that the references to Miss Cobb in the opening statement and in the stricken testimony might have prejudiced appellant and that the fairest course of action would be to grant a mistrial. Another alternative might have been to deny the motion for mistrial conditionally and require the Government to reopen its case and call Miss Cobb as a witness.

■ Instead, the judge decided to rely on giving a curative instruction. In many instances, a judge can avoid the necessity for a mistrial by suitable instructions and by assuring that the court members fully understand them. *See, e.g., United States v. Watkins,* 21 M.J. 224 (C.M.A.), *cert. denied,* 476 U.S. 1108, 106 S.Ct. 1956, 90 L.Ed.2d 364 (1986);[1] *United States v. Seymore,* 19 M.J. 608 (A.C.M.R.1984); *United States v. Gann,* 732 F.2d 714, 725 (9th Cir.) *cert. denied,* 469 U.S. 1034, 105 S.Ct. 505, 83 L.Ed.2d 397 (1984); *United States v. Steele,* 727 F.2d 580 (6th Cir.), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984); *United States v. Slocum,* 708 F.2d 587, 598 (11th Cir.1983); *United States v. Escalante,* 637 F.2d 1197, 1202–03 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980). Indeed, if such a remedy is adequate, it is a "preferred" method for curing the error when court members have heard inadmissible evidence, since the declaration of a mistrial is a rather drastic remedy. *United States v. Escalante, supra; United States v. Jeanbaptiste,* 5 M.J. 374 (C.M.A.1978); *United States v. Simonds,* 15 U.S.C.M.A. 641, 36 C.M.R. 139 (1966). Thus, the issue is whether the curative instruction avoided prejudice to appel-

lant or whether, instead, the failure to declare a mistrial was an abuse of discretion by the judge. *Cf. Burtt v. Schick,* 23 M.J. 140 (C.M.A.1986).

■ The curative effect of jury instructions has been discussed from time to time by the Supreme Court. In *Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954), the Court held that a New York procedure for determining the voluntariness of a defendant's confession was unconstitutional because, among other things, it relied too heavily on the jurors' ability to follow the trial judge's instructions that they should disregard the defendant's confession if they determined that it was involuntary. Similarly, in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court concluded that receipt in evidence of a codefendant's confession—*albeit* with limiting instructions—violated the confrontation clause, because too great a likelihood existed that the jurors would consider the confession against the defendant.

Recently, in *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), the Supreme Court reaffirmed the position taken in *Bruton.* Rejecting a view stated by the plurality opinion of four Justices in *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), the Court refused to recognize any exception to *Bruton* where the confession of a defendant "interlocked" with that of a codefendant. Justice Scalia's majority opinion in *Cruz* finds its rationale in this quotation from *Bruton:*

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human

---

1. In *United States v. Watkins,* 21 M.J. 224, 226 (C.M.A.), *cert. denied,* 476 U.S. 1108, 106 S.Ct. 1956, 90 L.Ed.2d 364 (1986), we affirmed the following limiting instruction:

    Let me tell you that yesterday I allowed the examination of Staff Sergeant Watkins by the trial counsel concerning questions about other acts involving violence and intoxication and correlation. Now, you will recall that the accused denied those acts. So that there is no evidence that such acts occurred. You may draw no inference that the acts occurred or

did not occur, and you may draw no inference that they did occur by my allowing the questions to be put to him. You may, additionally, draw no inference that he must have been involved or they would not have been asked ... or anything like that. All right. They were merely allowed to be put to him in an effort for the prosecution to show a plan or a design going to this kind of relationship between alcohol and violence. Any questions about that?
Negative responses.

limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect.

107 S.Ct. at 1717.[2]

Thus, it seems clear that in some situations an instruction to the jurors—or even to the members of a court-martial—cannot cure the harm that has been caused by erroneous admission of evidence. On the other hand, in *Tennessee v. Street,* 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), the Supreme Court unanimously upheld a conviction despite a claim that the defendant had been prejudiced by admission of an accomplice's written confession under limiting instructions. In this instance, the confession had been offered in rebuttal after the defendant had testified that his own confession had been coerced from him on the basis of an accomplice's confession. A prosecution witness then testified that the defendant had not been read the accomplice's confession; and this witness was allowed to read that confession to the jury after the trial judge had advised the jurors that it was not admitted to prove its truthfulness but only for the purpose of rebutting the defendant's claim as to the circumstances of his own confession. In this instance, the Supreme Court was willing to "rely on the 'crucial assumption' that the jurors followed 'the instructions given them by the trial judge.'" 471 U.S. at 415, 105 S.Ct. at 2082.

Of course, in *Street* the Court also emphasized that the necessity for introducing the out-of-court confession had been created by defendant's own testimony about the circumstances of his own confession; and "there were no alternatives that would have both assured the integrity of the tri-al's truth-seeking function and eliminated the risk of the jury's improper use of evidence." 471 U.S. at 415, 105 S.Ct. at 2082 (footnote omitted). Obviously—as *Cruz* later has confirmed—the Supreme Court in *Street* was not relying on curative instructions as an invariable means of correcting error and avoiding the necessity for a mistrial.

With these precedents in mind, we approach the facts of this case. In the first place, the military judge gave a cautionary instruction which not only advised the members that they should not consider the testimony which he had stricken but also explained why they should not consider it. From our reading of his explanation, we believe that it would have been very understandable to the members of the court-martial—all of whom were officers—and that they would have conscientiously attempted to comply with their sworn duty to follow the judge's instruction.

Admittedly, at one point in his instructions, the judge stated that Karen Cobb's absence had made "Agent Schmitz' testimony somewhat inadmissible, retroactively." Indeed, he should have stated that the testimony was "inadmissible" without any qualification, for "somewhat inadmissible" is an oxymoron, like "a little pregnant." However, the last part of his instruction—"you simply must not consider any information testified to by Agent Schmitz"—certainly makes its point.

The military judge properly asked whether the court members had "any questions about that." In *United States v. Steele, supra,* where erroneous admission of evidence of the defendant's incarceration was held to have been cured by the judge's instruction, the judge had asked the jurors whether they could disabuse their minds of a prejudicial remark and not consider it as to the guilt or innocence of the accused; had required that each juror who could disregard the remark raise his hand; and then had observed for the record that the

---

**2.** Of course, in some instances—as recognized in *Cruz v. New York,* 481 U.S. ——, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987)—the coaccused's confession will itself be admissible as substantive evidence.

hands of all the jurors were raised. Likewise, in *United States v. Slocum, supra,* where the prosecutor impermissibly had asked a witness about other misconduct of the defendant, the judge had inquired of each juror, "[Do] you feel you can follow the court's instructions and disregard [the question and answer] completely and have no bearing, whatsoever, as far as weighing the testimony as against these defendants?" 708 F.2d at 597–98 and n. 11. An affirmative answer had been obtained from the individual jurors.

We would have preferred here that the military judge had inquired specifically of each court member whether he could "disregard" the testimony of Agent Schmitz and had obtained an affirmative response to that question. However, even though the question was addressed generally to the members and there was no separate response, we believe that the judge's inquiry enhanced the beneficial effect of the curative instruction.

In *Street,* the instruction to the jurors was given to limit their consideration of evidence which was admissible only for a specific purpose. Here, the instruction was necessitated by reception of inadmissible evidence, which had come in as a result of a tactical misjudgment by the prosecutor in not calling Ms. Cobb. Moreover, unlike *Street,* the defendant had not in any way induced the situation which created the need for the curative instruction.

However, here we discern no prosecutorial misconduct, like that in *United States v. Carroll,* 678 F.2d 1208 (4th Cir.1982), where the Court held that the prosecutor's improper argument alluding to evidence not before the court and objectionable under Fed.R.Evid. 404(a) was reversible error despite a limiting instruction. Certainly, if we perceived that trial counsel in this case had never from the outset intended to call Miss Cobb as a witness, we would be more inclined to find prejudice.

According to one court, "Proper instructions will usually suffice to correct damage from any erroneously admitted evidence or evidence admissible only for a limited purpose." *See Cramer v. Fahner,* 683 F.2d 1376, 1384 (7th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 376, 74 L.Ed.2d 509 (1982). We do not know that we would go so far in assessing prejudice. However, it seems clear to us that the testimony of Agent Schmitz and trial counsel's reference in his opening statement to the expected testimony of Karen Cobb would have had much less impact on the court members than would an extrajudicial confession by an accomplice—like that involved in *Bruton* and *Cruz.* Indeed, they probably would have had less impact than improperly admitted evidence of uncharged misconduct—which often has been cured by jury instructions. *Cf. United States v. Steele* and *United States v. Slocum,* both *supra.* With these circumstances in mind, we conclude that here the military judge's curative instructions and inquiry of the members provided an adequate remedy.

### III

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

Judges COX and SULLIVAN concur.