UNITED STATES

v.

**Staff Sergeant Thomas E. HEIMER, FR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, United States Air Force.**

**ACM 28559.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 3 Feb. 1990.

Decided 20 Dec. 1991.

Appellate Counsel for the Appellant: James E. Nancarrow (argued), Colonel Richard F. O'Hair, Colonel Jeffrey R. Owens, Major Ronald G. Morgan, and Major Ronald A. Gregory.

Appellate Counsel for the United States: Major Leonard R. Rippey (argued), Colonel Robert E. Giovagnoni, Lieutenant Colonel Brenda J. Hollis, Major Jeffrey C. Lindquist, and Major Paul H. Blackwell, Jr.

Before LEONARD, RIVES and McLAUTHLIN, Appellate Military Judges.

## OPINION OF THE COURT

McLAUTHLIN, Judge:

Contrary to his pleas, Staff Sergeant Thomas E. Heimer was found guilty of two counts of sodomy by his general court-

martial panel of officers. He was sentenced to a dishonorable discharge, confinement for 8 years, total forfeitures, and reduction to E–1. The appellant raises four issues on appeal. We find none persuasive and affirm.

## I

### Factual Background

The investigation leading to Heimer's court-martial began when his adult natural daughter, hereinafter referred to as "S", provided a statement to the Air Force's Office of Special Investigations (OSI). S said she had been sexually abused by her father and she believed that Heimer was now sexually abusing his eleven-year-old stepson, hereinafter referred to as "J". The acts allegedly committed against J became the subject of both of the appellant's sodomy specifications.

Early in the trial, the military judge granted the appellant's motion in limine to exclude references by any witness to the uncharged sexual misconduct S had described in her statement. According to the trial counsel, the government did not intend to call S as a witness. The prosecutor indicated the only reference to her statement would be "about how the investigation started," and this would be limited to the extent that "information from an outside source was presented, not what that information is, not who that person is."

During J's direct testimony, government counsel asked the boy if he told anyone about the sexual abuse. J replied, "No. [S] wrote a letter." He did not say who "S" was, what the letter said, or where the letter went. After cross-examining the boy, the defense counsel moved for a mistrial based on the reference to S's statement. The defense counsel argued, "The members are going to know that there is evidence out there that they don't have and they're going to draw inferences from the lack of that evidence." The military judge replied:

I'm not going to engage in speculation about what kind of inference they may or may not draw. If they do ask for it, I'll just tell them to draw no inferences from that information, that's merely the way the investigation began. To me it's just not comprehensible that they would draw the inference that the information that is out there has to do with [S].... The motion is denied.

Later, a civilian social service worker testified about the interview he conducted with J in the presence of an OSI agent. During this testimony, Major [L] from the panel submitted the following question:

What events led to the [social worker's] interview on 11 Oct? Had there been a previous allegation or complaint which led to the investigation? If so, can we hear who made the complaint which led to ... the investigation?

The military judge excused all members except Major L to clarify the question. Major L explained that he was wondering why an OSI agent was present for the interview "unless there had been probable cause or some sort of child abuse prior to them being there." When the members returned, the military judge explained that Major L's question:

... was one of probable cause as to the investigation or the legal route of the investigation. This is a determination which has been made which is not important for your decision. In other words, that is a legal decision that has already been taken care of. What you need to be concerned with is whether or not the allegations have been established as I'll fully instruct you later on. But the legal propriety of the investigation is beyond your charge. That's not what you're here to decide. So if that is troubling you, you should not be troubled by that and no inference should be drawn by you as to whether or not this was a legal investigation or an illegal one. That's not your concern.

Soon after closing to deliberate on findings, the panel returned to ask, "What started the investigation? Specifically, was the source independent of [J]?" In the subsequent Article 39(a) session, the military judge and counsel discussed how best to deal with this recurring inquiry. The

military judge explained that his reading of *United States v. Castillo*, 29 M.J. 145 (C.M.A.1989), led him to conclude that some information could be released to the members in response to their question. According to the judge, "The distinction that I'm willing to make ... in light of the question is the distinction between the abuse [S said happened] to herself and the suspicions that she had about [J]." He ruled, "[T]he abuse to [S] ... is not admissible but the suspicions that she held about the children is."

The judge then asked counsel how best to present this information. Ultimately, the military judge read the following Stipulation of Expected Testimony to the members:

A letter was received in August of 1989 by the Office of Special Investigations from [S]. [S] is the natural daughter of SSgt Heimer by a previous marriage. Contained therein was information that [S] had visited the Heimer household. She asked the boys, [J] and [T], what they did with SSgt Heimer when Mrs. Heimer was at work. [J] said, "We're supposed to say we're playing Yahtzee. Right [T]?" [J] disclosed no evidence of abuse, however, [S] did not believe the response and subsequently contacted the OSI. [S] did not observe any acts of abuse during her visit.

The defense counsel agreed that the stipulation contained what the OSI agent would say if called to testify, but objected to the information's relevance and undue prejudice.

The court president indicated the stipulation satisfied the panel's inquiry, but after another hour of deliberation, the panel returned again to ask if S's August 1989 letter was admissible "for the purpose of clarifying if J had made any statements, or in any way inferred that child sexual abuse had occurred." The intent of the question, according to the note submitted by "Maj [L] et al," was "to establish whether [J] *specifically* motivated her to write the letter, or if she was motivated by *any* assessment of this case *independent* from [J]." (emphasis in the original)

The members were excused and the defense counsel again moved for a mistrial, arguing that the court members were proceeding along the trail of evidence blocked by the successful motion in limine. The military judge denied the defense motion. Then, after discussing options with counsel, he informed the members that the letter was not admissible and their question had been answered to the extent possible.

The panel returned to deliberate, but came back yet again with questions for J. According to another note submitted by Major L, the members wanted to ask J:

Before you talked to [the social worker] at the school you said you had told your mother about having sex with your dad on one occasion. Is that correct? Did you at any time tell anyone else? Did [S] ever ask you questions about it? What was your reply?

Out of the hearing of the members, the military judge asked J the members' questions. The boy repeated his earlier response that, before talking to the social worker, his mother was the only person he told about having sex with his father. J also said he responded to S's question by telling her "we played games, Yahtzee, and stuff like that."

J was excused and the defense moved once again for a mistrial, arguing "This panel has obviously stepped out of the role of being impartial and into the role of trying to prove the government's case." The military judge denied the defense motion. Then, J was allowed to repeat his answers before the members. The military judge permitted another findings argument from both sides, insured the members desired no further instruction, and closed the court. The next time the panel returned, the president announced their findings of guilty.

## II

### Appellant's Post–Trial Questionnaires

After trial, the appellant's trial defense counsel sent a four-page "Court Member Questionnaire" to each panel member. In the first section of the questionnaire, the members were asked to rate the "impact"

of the testimony of each witness that appeared in the court-martial on a scale from "1" to "4," "1" signifying no impact and "4" representing a "substantial" impact. Then, using the same scale, the members were asked:

What impact (if any) did the initial mention of [S] ... have on the overall substance of the evidence (circle the appropriate number): 1 2 3 4

. . . .

What impact (if any) did the additional evidence concerning [S] ... have on the overall substance of the evidence (circle the appropriate number): 1 2 3 4

In the next section, again using the same four-point scale, the appellant's counsel asked the members to evaluate each side's arguments and voir dire. Then, the members were asked to respond to a series of questions, including:

What concerned you most (if anything) about [J's] ... testimony?

What concerned you least (if anything) about [J's] ... testimony?

If you were prosecuting the case, the one (or more) thing(s) that you would definitely change in presenting the evidence was:

If you were defending the case, the one (or more) thing(s) that you would definitely change in presenting the evidence was:

In capital letters, the phrase "DO NOT REVEAL YOUR VOTE OR THE VOTE OF ANY OTHER MEMBER" was written across the bottom of each page of the questionnaire.

There is an understandable judicial reluctance to permit inquiry into the state of mind of a court member after a court-martial has adjourned. This is to avoid harassment of court-members with attempts to secure evidence that might impeach a verdict. *See United States v. Crosby*, 294 F.2d 928 (2d Cir.1961), *cert. denied*, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962).

■ Mil.R.Evid. 606(b) sets out those circumstances permitting inquiry into the validity of findings or sentence. Judge Cox, recapitulating the rule in *United States v. Accordino*, 20 M.J. 102, 104 (C.M.A.1985), lists the only three circumstances when a court member's affidavit or testimony impeaching a verdict is appropriate: 1) when extraneous information has been improperly brought to the attention of the court members; 2) when outside influence has been brought to bear on a member; and 3) when unlawful command influence has occurred. *See also* R.C.M. 923; *United States v. Bishop*, 11 M.J. 7 (C.M.A.1981).

■ The rule allows post-trial reflection regarding *objective* manifestations of impropriety. Panel members can say, for example, that inadmissible evidence was placed in their deliberation room. *See United States v. Pinto*, 486 F.Supp. 578 (E.D.Pa.1980). But Mil.R.Evid. 606(b) and its substantially similar civilian counterpart, Fed.R.Evid. 606(b), prohibit the impeachment of a verdict based upon alleged transgressions that are *subjective* in nature. Thus, panel surveys should not be used to support allegations that the court ignored the trial judge's instructions and convicted the accused because he failed to take the stand in his own defense, or that the members were emotionally influenced by some event at trial. *See United States v. Edwards*, 486 F.Supp. 673 (S.D.N.Y. 1980); *United States v. Greer*, 620 F.2d 1383 (10th Cir.1980); *see also* Editorial Comment to Mil.R.Evid. 606(b), Salzburg, Schinasi, and Schlueter, *Military Rules of Evidence Manual* 506 (2nd ed. 1986).

■ The post-trial questionnaires used in this case were improper for at least two reasons. First, the use of the members' responses is misleading. The appellant asserts, for example, that four out of the five panel members replied on their questionnaires that they felt the "additional evidence" about S "had a substantial impact on the overall substance of the evidence." But, these were *not* the members' statements. By circling numbers after a carefully worded interrogatory, the members were merely echoing the defense counsel's pre-packaged phrases.

Second, and more importantly, the portions of the questionnaires the appellant

relies upon fit *none* of the specific exceptions to Mil.R.Evid. 606(b) permitting inquiry into the validity of the members' findings. The inquiries were not designed to disclose objective, extraneous matters that may have improperly influenced the panel's deliberations. Instead, these questions sought to impeach each panel member's subjective interpretation of the evidence—the precise material the rule seeks to protect.

### III

### Appellant's Motions for Mistrial

The appellant's initial assignment of error is linked, in part, to the responses he received to these post-trial questionnaires. He asserts that "the repeated questions by the members about [S] show that they were not following the military judge's instructions to draw no inferences from how the investigation began." He maintains that the members' questionnaire responses "confirm the use and impact of evidence" about S. Therefore, he contends that the trial judge should have granted his motions for mistrial.

■■■ We do not agree. Mistrial is appropriate when curative instructions are inadequate to remove the prejudicial effect of evidence erroneously placed before the members or when the court members engage in prejudicial misconduct. R.C.M. 915(a), Discussion; *see also United States v. Evans*, 27 M.J. 34 (C.M.A.1988), *cert. denied*, 488 U.S. 1011, 109 S.Ct. 797, 102 L.Ed.2d 788 (1989). Declaration of a mistrial is a drastic remedy, and a motion for mistrial should be granted only to prevent a manifest injustice against the accused. *United States v. Rushatz*, 31 M.J. 450 (C.M.A.1990).

■■■ Our review discloses nothing warranting the declaration of a mistrial in this case. First, the panel never even received the protected prejudicial evidence. The military judge scrupulously precluded any mention of the appellant's alleged sexual abuse against S. In addition, he continually reminded the members that their responsibility was to evaluate only the evidence properly before them, and that they should not concern themselves with how the investigation might have started. Absent evidence to the contrary, members are presumed to have complied with the judge's instructions. *See Lakeside v. Oregon*, 435 U.S. 333, 340, 98 S.Ct. 1091, 1095, 55 L.Ed.2d 319 (1978); *United States v. Ricketts*, 1 M.J. 78, 82 (C.M.A.1975); *Donaldson v. United States*, 248 F.2d 364 (9th Cir.1957), *cert. denied*, 356 U.S. 922, 78 S.Ct. 706, 2 L.Ed.2d 717 (1958).

The appellant points to the panel's continuing questions and concludes this means they drew "inferences about why the investigation began and used inadmissible evidence of uncharged misconduct to convict" him. We find to the contrary. The members continued to ask questions because they did not have the evidence the military judge would not let them have. Had they reached the conclusions the appellant says they did, would not the questions have ceased? Instead of demonstrating an inability to follow the military judge's instructions, the panel's on-going questions about S and the beginning of the investigation confirm that the judge's methods effectively kept the panel from learning about the appellant's uncharged misconduct.

Nor should the members be faulted for their curiosity. As a group, they were trying to learn all they could about the appellant, his accuser, and the other witnesses before them. Appellate government counsel correctly make the point:

> Unfortunately, being laymen, the members could not appreciate the can of legal worms that would be opened if they were permitted to have any and all of their questions answered. That is one of the reasons we have judges—to prevent matters that may have logical relevance but that are nonetheless legally proscribed from reaching the members. And that is exactly what the judge in this case did. He prevented evidence of the appellant's other bad acts ... from reaching the members.

The military judge did not abuse his discretion in denying the appellant's motions for

mistrial. R.C.M. 915; *United States v. Jeanbaptiste*, 5 M.J. 374 (C.M.A.1978).

## IV

### Burden of Proof

█ The appellant's next asserted error is based entirely upon his counsel's post-trial questionnaires. As noted above, each member was asked what he would change if he had prosecuted or defended the case. One said, as *either* the prosecutor or the defense attorney, he would have called the appellant to testify. Another mused, "Short of putting [the appellant] on the stand, probably no other evidence was available." Now, based on these two statements, the appellant maintains "[t]he responses by the members ... show that they expected the appellant to deny the allegations, thereby negating the presumption of innocence and shifting the burden of proof to the appellant."

Again, we disagree with the appellant's use and appraisal of the members' responses. These are nothing more than the thoughtful reflections of two of the five panel members to defense counsel's post-trial inquiries. Since they did not get an opportunity to hear the appellant testify, it is not unreasonable that one, or two, or *all* of the panel members would say they wanted to hear his side of the story. But nowhere do any of the members infer that the court convicted the appellant because of his silence, or that his silence was held against him in any way.

## V

### Discovery

█ The appellant also contends the court's findings and sentence should be set aside because he was not provided with pre-trial discovery information he requested regarding his daughter, S. As noted above, it was S's letter to the OSI that triggered the investigation resulting in the appellant's court-martial.

Before trial, the appellant submitted a request for information pursuant to R.C.M. 701 and R.C.M. 405(g), including a request for "evidence tending to diminish credibility of witnesses." At the beginning of the trial, the defense counsel told the trial judge he had learned that there might be some discrediting information about S. The defense counsel said he needed "extrinsic evidence to impeach this witness if she should testify." The military judge instructed the trial counsel to find the information and stated, "If it comes to pass that she testifies, we'll revisit this issue."

Later in the proceedings, trial counsel made it clear that S would not testify. Referring then to the earlier discovery request, the military judge said, "Well, clearly if you're not going to call her, then we need not do anything else about this matter." The defense voiced no objection. Under these circumstances, we find no abuse of discretion by the military judge in not responding further to the appellant's discovery request. *United States v. Reece*, 25 M.J. 93 (C.M.A.1987).

For the first time on appeal, the appellant contends he needed information about S to "fully investigate the circumstances surrounding the investigation" and to "explore the possible influence" S may have had over J. This overlooks the fact that the appellant had unfettered access to S and J before trial, and that his counsel interviewed both. In addition, the defense had the opportunity to explore the basis of J's testimony when J first took the stand. Then, in response to a question from the panel during their findings deliberations, J was recalled. The military judge asked J the panel members' questions and offered both counsel yet another opportunity to examine the boy and the basis for his accusations.

The appellant was not hindered by reduced access to information about S. Before and during the trial, he had sufficient opportunity to inquire into the factual basis for the charges and to examine any possible influence S may have exercised over J.

## VI

### Sufficiency of the Evidence

Finally, the appellant asserts the evidence against him is insufficient to support

the findings of guilt. Pointing to the inconsistencies in J's pre-trial statements, the appellant suggests that reasonable doubt is created in this case. Again, we do not agree.

■ In addressing the appellant's evidentiary challenge, we must determine not only the legal sufficiency of the evidence but also its factual sufficiency.

> The test for the former is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 309 [99 S.Ct. 2781, 2783, 61 L.Ed.2d 560] (1979). For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are convinced of the accused's guilt beyond a reasonable doubt.

*United States v. Turner*, 25 M.J. 324, 324–325 (C.M.A.1987).

■ Not surprisingly, J was the only witness to the sodomy charges. Charges of this nature will almost always be reduced to a one-on-one confrontation since there will ordinarily be no witnesses. *See United States v. Hanson*, 30 M.J. 1198, 1202 (A.F.C.M.R.1990); *United States v. Lecappelain*, 9 M.J. 562 (A.F.C.M.R.1980). The determination of guilt in this case depended greatly upon the weight the members chose to give to the boy's testimony.

J's detailed testimony was completely consistent with what he told an OSI agent and a social worker when he was interviewed at school on 11 October 1989, and with what he said in a second interview two days later. At trial, J admitted that he later changed his story because of his mother's beatings. J's explanation was verified to some extent by a neighbor who testified that she heard J's mother yelling and hitting the boy while demanding he recant his accusations.

Heimer's own statement to the OSI offered some corroboration for J's allegations. An OSI agent testified that he interviewed the appellant the same day of J's disclosures. After rights advisement, the appellant remarked that if anything had happened with J he must have been drunk, and that he did not remember anything happening with J. In the OSI interview, Heimer also denied that anything at all had happened with his natural son, T.

J's mother and grandmother each offered testimony that they felt J "has a tendency to lie." The members were able to see and hear all the witnesses, and determine who to believe. Counsel for both sides presented the court with clear pictures of the motives and biases of all the parties. Applying the tests for legal and factual sufficiency to the facts before us, we conclude that a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. We are also independently convinced of the appellant's guilt beyond a reasonable doubt. Article 66(c), UCMJ.

## VII

### Jurisdiction

■ The record of trial and allied papers in this case did not establish that personal jurisdiction existed to try the appellant for the entire period described in his second sodomy specification. The charge sheet (DD Form 458) in the record of trial states that the appellant's initial date of service is *15 May 1987*. Based upon the specification in question, the appellant stands convicted of sodomy on divers occasions between on or about *1 November 1986* and on or about 31 July 1989. There was no documentation in the record of trial or allied papers to support a determination of whether the appellant reenlisted on 15 May 1987 with or without a break in service. *See United States v. Clardy*, 13 M.J. 308 (C.M.A.1982); R.C.M. 202, Discussion.

We ordered the government to show cause why the findings of guilty to the portion of the specification describing conduct before 15 May 1987 should not be set aside for lack of personal jurisdiction over the appellant. The government has now provided us with appropriate documentation showing that the appellant was dis-

charged from his prior enlistment early solely for purposes of reenlisting on 15 May 1987, and that his military status remained uninterrupted. We are, therefore, persuaded that court-martial jurisdiction existed to try the appellant for the portions of the offense occurring during his prior enlistment.

### VIII

Having examined the record of trial, the assignment of errors, and the government's reply thereto, we conclude that the findings and sentence are correct in law and fact, the sentence is appropriate, and no error prejudicial to the substantial rights of the accused was committed. Accordingly, the findings of guilty and the sentence are

AFFIRMED.

Senior Judge LEONARD and Judge RIVES concur.